

www.jamsadr.com          THE RESOLUTION EXPERTS          Offices Nationwide

# Fax Cover

**To:**  Jonathan Preziosi, Esq.          **Phone:** 609-951-4153          **Fax:** 609-452-1147
  *Pepper Hamilton, LLP*

  Angelo Stio, Esq.                        609-951-4125                    609-452-1147
  *Pepper Hamilton, LLP*

  Kevin Hart, Esq.                         609-896-9060                    609-895-7395
  *Stark & Stark*

**From:**  Stacey Harrison          **Phone:** 202-533-2021

**Date:**  Tuesday, December 27, 2005          **Pages (including Cover):**   34

**Case Name:**  Frank W. Hake, Inc. vs. Lurgi Lentjes North America, Inc.

**Reference:**  1410003829

---

**Comments:**

Dear Counsel:

   Please find a copy of the Interim Award. If you have any questions, please do not hesitate to contact me.

Best,
Stacey Harrison

This facsimile transmission is confidential. If you have received this transmission in error, please notify the sender at the number listed above and discard the transmission. Thank you for your assistance.

555 13th Street, NW • Suite 400 West • Washington, DC 20004 • TEL 202.942.9180 • FAX 202.942.9186

# JAMS ARBITRATION

FRANK W. HAKE, INC.,                    )
    Claimant/Counter-Respondent,        )
                              )
                               )
       v.                                   )    Reference No. 1410003829
                               )
LURGI LENTJES NORTH AMERICA, INC.,      )
    Respondent/Counter-Claimant.         )

## INTERIM AWARD

### Introduction

    This construction arbitration was initiated in September 2004 through the filing by Frank W. Hake, Inc. ("Hake") of a Demand for Mediation and Arbitration pursuant to the dispute resolution provision (§ 25) of its May 14, 2003 Subcontract Agreement ("the Subcontract") with Lurgi Lentjes North America, Inc. ("Lurgi"). Mediation before the Honorable Richard A. Levie failed to produce a resolution and the parties proceeded into arbitration. I was appointed the arbitrator and conducted a preliminary conference with counsel on April 4, 2005. Pursuant to that conference, I issued on April 4, 2005 an order setting a schedule for pre-hearing activities, including discovery, and a twelve day hearing beginning on September 6, 2005.

    Discovery was conducted pursuant to this order and was largely uneventful. On August 1, 2005, Craig Hillard, the Stark & Stark partner in charge of Lurgi's legal team became ill and was soon replaced by Stark & Stark partner Kevin Hart. Mr. Hart sought a continuance (of unspecified duration) to familiarize himself with the case. In Order No. 6, for reasons set forth therein, I continued the commencement of the hearing to September 19, 2005. On that date, Mr. Hart appeared at the hearing with co-counsel Martin Schrama and Glen Azzinari, who have been in the case from the beginning. To his credit, Mr. Hart was well prepared and conducted the hearing on behalf of Lurgi without further complaint.

Hearings were held on September 19, 20, 26, 27, 28, 29 and 30 and October 4, 5, 6, and 7, 2005. Each side submitted approximately 30 thick binders of contract documents as exhibits and called a number of witnesses. Hake presented live testimony of David Kazokas, Bernard Finucan, Thomas Frederick, Michael Bray, Russell Patton, Jonathan Howard, and Walter Wachter as well as the deposition testimony of James R. "Rob" Cash. Lurgi presented live testimony of Scot Ojard, Mark Pavlosky, Ralph Lebron, George Keil, and Joseph Strum. Shortly after the hearing began, Lurgi's retained expert Willis Hembree became ill and unable to testify. Lurgi made arrangements for Stephen Dellers, Mr. Hembree's partner, to take his place. On September 29, 2005, the parties agreed to recess the hearing from October 7 until November 18, 2005 so that Mr. Dellers could get up to speed. The hearing continued on November 18, 19, 20, and 21, 2005 with testimony from Messrs. Wachter and Dellers and brief testimony from Mr. Kazokas. The parties submitted their final briefs on November 18, 2005 and gave closing arguments on November 22, 2005.

The record in this case is huge, consisting of more than 4,000 pages of testimony and tens of thousands of pages of project records. In that context it is incumbent upon counsel to direct my attention to those parts of the record that allegedly support their contentions; it is neither appropriate nor feasible for me to search the record to see if I can find any support for such contentions. Accordingly, my review of evidence has been restricted to those items identified by the parties in their final briefs, except for those instances in which I was able to recall and readily locate some other evidence. My factual conclusions are based on the evidence just described, my evaluation of the demeanor and credibility of the witnesses, and all reasonable inferences to be drawn from the record as a whole.

In their final briefs, totaling over 100 pages, the parties have advanced a multitude of arguments and contentions. Addressing every one would require an award of excessive length. Accordingly, this award will discuss only the principal issues raised by the parties. However, the parties should be assured that all of their arguments have been heard and carefully considered.

Section I of this Interim Award presents my conclusions concerning the root causes of the damages which are the subject of the claims and counter-claims herein. Hake's substantive claims are discussed in Section II of the Award. Lurgi's claims are discussed in Section III. Section IV addresses Hake's claim for attorney's fees. Section V summarizes the amounts awarded to date. And Section VI sets forth a schedule for concluding the proceedings.

## I. WHAT WENT WRONG?

In 2002 PSEG Fossil, LLC ("PSEG") awarded to Lurgi an EPC (engineering, procurement, and construction) contract of roughly $85,000,000 (Tr. 4013) for the installation of two Selective Catalytic Reactor Systems ("SCRs") at its Mercer, New Jersey power generation facility. As a result of pollution abatement litigation brought by the U.S. Environmental Protection Agency and the New Jersey Department of Environmental Protection, PSEG was under court order to have these SCRs in operation by a date certain in 2004 or shut down operations. The good news is that the SCRs were built and have been operating, apparently successfully, for more than a year. The bad news is that getting them built was anything but a smooth process.

After executing the contract with PSEG, Lurgi began to line up subcontractors in early 2003. One of the most important of those was the subcontract for the installation of the civil, structural, and mechanical work at the site. This subcontractor was basically responsible for erecting the massive steel structures for the SCRs. Much of this work had to be substantially completed before the other subcontractors could undertake their work.

In January 2003, Lurgi issued a Request for Quotation ("RFQ") to Hake and other companies who were deemed capable of this important foundational work. Several responded with bids, and Lurgi soon commenced negotiations with some of them. Unfortunately, the negotiation process went slowly. Although it had been expected that the steel erection subcontractor would be able to begin work in March, by early May

there was still no subcontract in place. Finally, on May 14, 2003, Lurgi and Hake executed the Subcontract before me, and Hake began its work some two months later than planned.

The delay in letting the contract was a harbinger of what was to follow. In the months ahead, Hake's work fell farther and farther behind schedule, even though its steel crafts were working two ten-hour shifts Monday – Friday. By November 2003, Hake extended those two shifts to Saturdays and Sundays as well. Even so, Hake did not achieve the milestone completion dates set forth in Attachment C to the Subcontract. Delays in erection of the steel, including the pivotal mezzanine, had a snowballing effect and put various other subcontractors behind their schedules also. Given that PSEG wouldn't, and really couldn't, extend the end dates for the project, Hake and other subcontractors incurred heavy costs in working extra shifts to try to get the project back on schedule and to correct numerous problems that arose in the course of construction. While the instant arbitration focuses only on claims between Hake and Lurgi, the cascading effects of widespread delays and construction errors have spawned multiple arbitrations between Lurgi and other subcontractors and between Lurgi and PSEG.

The central issue in this arbitration has been determining who was responsible for the massive delays and cost overruns experienced by Hake. Does the fault lie with Hake or with Lurgi and its other subcontractors? In trying to answer this question, which is typical of construction disputes, I place little stock in the sort of self-serving letters and notices with which Hake and Lurgi, like most construction case combatants, papered their files. Rather, I have found it necessary to carefully assess the credibility and competence of the parties' witnesses who appeared before me, to consider the opinions of non-party witnesses, and to note instances in which the contemporaneous documents reflect significant admissions by the parties.

Hake put on a generally impressive array of witnesses. Project Manager David Kazokas, who was on the site daily from start to finish of the project, came across as highly knowledgeable, competent, and credible. I found his testimony plausible, sincere,

4

and generally consistent with the believable documents. My assessment of him is the same as that of Lurgi's site manager Rob Cash: Kazokas is "an honorable man" whose account of events is generally trustworthy. (Cash Depo. at 126). Bernard Finucan, superintendent of Hake's boilermakers, and Tom Frederick, Hake's Quality Assurance Director, also impressed me as credible and extremely competent. Hake's President Mike Bray was, just as Cash described him (Id. at 177) a nice, level-headed man. Hake's retained expert Walter Wachter was, as Lurgi's counsel described him (Tr. 4123), "a very, very impressive witness" who has been "involved from day one." He plainly has a vast knowledge of exactly how things got so badly off track

     Lurgi, on the other hand, did not put on such a strong testimonial case. For unknown reasons, Lurgi did not call its Project Manager David Lossw, nor its Construction Manager Lance Risinger, nor its Site Manager Rob Cash. (Instead, Hake submitted Cash's deposition testimony.) Scot Ojard, Lurgi's Director of Construction nationwide, is clearly knowledgeable and experienced but had little day-to-day involvement in the project until the bitter end. Mark Pavlosky appeared credible and competent, although he seems to have let the major mistake in MS 13 (i.e., not locking in the Attachment C milestone dates) slip past him. Ralph Lebron is a very smart engineer who made a good witness. George Keil and Joe Strum were far less impressive. Where there are conflicts in the testimony of the Hake and Lurgi lay witnesses, I generally found the Hake account more credible. Stephen Dellers is a smart, careful engineering consultant who was given a limited assignment by Lurgi counsel and carried it off quite well.

     Evidence from other sources was also helpful to me. This included the apparently unsolicited testimonial of Howden's A. Pilkington that Hake's "maintaining of the rotor shape after welding of rotor ranks as one of the best that I have ever seen during the last several years of erection of pre-heaters / gas heaters being some 30 + in total." (Hake Ex. 122). The credible testimony of PSEG's Jonathan Howard that Lurgi lacked sufficient resources to properly manage this project was also significant to me. This testimony was consistent with several admissions by Lurgi contained in progress reports and minutes of

5

the monthly and weekly project meetings conducted by PSEG, which were, in turn, largely consistent with the deposition testimony of Rob Cash. Of course, the fact that PSEG ultimately terminated Lurgi for cause and hired Hake to complete Lurgi's work speaks volumes.

The great weight of the evidence before me establishes that the predominant causes of the delays and excess costs encountered on this job were (1) late and deficient design drawings by Lurgi subcontractor CDI; (2) late and misfabricated steel supplied by Lurgi subcontractor Blazer; and (3) inadequate project management by Lurgi. As to the first two items, it will probably fall to some other arbitrator to sort out the finger-pointing between Lurgi and CDI and between Lurgi and Blazer. For purposes of this case, it doesn't matter how those disputes turn out since, as regards Hake, Lurgi is liable for its own mistakes and also those of its other subcontractors. As to the third cause, the record unfortunately shows that Lurgi left this project largely in the hands of a smart but inexperienced young man who was simply over his head. Throughout 2003, Ojard, Losaw, and Risinger were on site less than once a week. (Cash Depo. at 20-25). This left Cash responsible for all aspects of the job, including coordination of subcontractors, schedule management, and interface with the owner. (Id. at 11-12). Given the extremely tight time frame for this job, it would have been difficult for even a seasoned manger to get the work successfully completed on time. But for a young man only nine years out of college (with two years of study and no degree) (Id. at 10-11), it proved impossible. Cash simply did not have the know-how to do it, and he apparently got little help and lots of pressure from Lurgi's management. As the project unfolded and got farther and farther behind, Cash felt frustrated and "unable to determine a solution for the problems on the job site." (Id. at 169). That frustration apparently led Cash, in a display of immaturity and poor judgment, to create an inappropriate website, whose discovery by PSEG promptly led to his being thrown off the job site.

The effects of these root causes on Hake's work were myriad and markedly adverse. Under their Subcontract, Lurgi was responsible for timely delivering to the job site the proper construction materials and drawings that Hake needed to do its job.

However, as confirmed by numerous project documents and testimony of multiple witnesses, many of these items were delivered days, weeks, or even months after they were due. These included Unit 1 "TE" columns, truss pieces, turning vanes, 324 filler beams for the mezzanine, the last section for Unit 1 SCR lower box module # 2, the low leak fan for Unit 2, Unit 1 Tier 2 steel, the low leak fan for Unit 1, the north stair tower for Unit 2, platforms for the NH3 tanks, soot blower support steel, and columns for the mezzanine stairways. As of January 29, 2004, some of the steel for Unit 2, which was scheduled to be delivered by July 31, 2003, had still not arrived. As of February 3, 2004, some of the structural steel for Unit 1 had yet to be delivered.

Moreover, construction drawings, which were revised over 50 times (Id. at 41), often were late. Prime examples were the turning vane installation drawings, drawing for installation of a mezzanine truss, and the last minute design change which required installation of 324 filler beams on the mezzanine. These latter delays were particularly significant since, as Mr. Howard testified, everyone recognized that construction of the mezzanine was the key to getting the project completed on time. (Tr. 1394).

In addition to late deliveries, numerous steel fabrication and design errors delayed Hake's work and required remedial work. These included:
- Design errors resulting in the rerouting of utility lines.
- Design errors within the TE line at the foundation level.
- Design errors with Units 1 and 2 duct Segment 2A expansion joints 102 and 103.
- Design errors with mezzanine trusses hitting existing steel and hydobins.
- Design errors with Units 1 and 2 expansion joints 105 and 106.
- Design errors creating interference between structural steel and GGH girders.
- Design errors with sequence 5 inlet duct to the SCR.
- Warped support beams.
- Steel member bolt hole misalignments.
- Column base plate misalignments.
- Connections for beams, plates, and columns were off-center, short, or misaligned.
- Steel parts welded by the fabricator at the wrong location or wrong angle.

Problems of this sort led Hake to issue more than 500 Requests for Information ("RFIs"), many of which were answered late by Lurgi or not at all.

All of these problems are thoroughly documented in Hake's contract records. Many were also admitted by Lurgi in progress reports to PSEG and in weekly and monthly construction meeting with PSEG. Extensive steel fabrication errors by Blazer and "malfeasance" by CDI were also acknowledged by Cash in his deposition at 67, 71, 73, 75-86, and 92-93.

In sum, I find that factors beyond Hake's control were responsible for the vast majority of the delays in Hake's work, which then caused delays for Lurgi's other subcontractors. This is not to say that Hake never made a single mistake on the job. That level of perfection is not found in construction work like this, or indeed any other human endeavor. However, the record as a whole shows that David Kazokas managed Hake's work in a skillful and effective fashion, that Hake's workers were well supervised and competent, and that Hake performed its work in a conscientious and workmanlike fashion.

Having thus identified the root causes of the problems which plagued this project, I turn now to consider the specific claims advanced by Hake and Lurgi, bearing in mind that each claimant has the burden of proving not only its entitlement to some recovery but also that it has established the amount of its damages with reasonable certainty. In order to avoid dealing with ten-digit numbers (which exceed the capacity of my calculator), I have rounded all monetary figures to the nearest dollar.

## II. HAKE'S CLAIMS

### A. Balance Owed on Contract Price and Approved Change Orders

#### 1. Base Price

Per § 5.1 of the Subcontractor, the base price for completion of Hake's original scope of work was $28,450,655. Lurgi agrees that it is required to pay to Hake that percentage of this price which reflects the percentage of Hake's base work that had been completed as of June 4, 2004, when Lurgi was terminated by PSEG. Lurgi contends that this percentage is 95.2%. However, that was the percentage which both parties agreed had been completed as of April 23, 2004. During the six weeks from April 23 through June 4, 2004, Hake completed further portions of the work.

I find credible and accept the expert opinion of Walter Wachter that, as of June 4, 2004, Hake had completed 99.7% of the base work. Joseph Strum's testimony that the completion percentage was less than that is rejected; testimony of Wachter and Kazokas shows Strum's analysis was based on an out-of-date March 2004 punch list, contained many errors, and was unreliable.

In its final Damages Summary, Hake has deducted from the contract price $90,149 for 0.3% work uncompleted as of June 4, 2004. Although it appears that a proper mathematical calculation would result in a lower deduction ($28,450,655 X 0.3% = $85,352), I will utilize Hake's figure for purpose of determining its recovery. Thus, Hake will be awarded $28,360,506 (i.e., $28,450,655 - $90,149) for balance owed on the base contract price.

## 2. Approved Lump Sum Change Orders

Hake and Lurgi agree that Hake is entitled to be paid $2,427,107 for "lump sum" change orders which were approved by Lurgi and completed by Hake.

## 3. "Ten Day Positive Float" Payment

Hake contends it is entitled to be paid the additional amount of $1,598,875 provided for in § 5.1 of the Subcontract. While this section, like others in this document, was not drafted with optimum precision, I conclude that it makes reasonably clear that Hake must do three things to earn this payment:

> (a) Hake must provide to Lurgi a work schedule which shows Hake beginning its work on the date of the Subcontract and achieving the Substantial Completion to Support Checkout ("SCSC") milestones set forth in Attachment C with ten days of positive float.

> (b) Hake must perform all of its civil work on a six day per week, ten hour per day basis, and must, on all other work, employ two shifts of ten hours each five days per week.

> (c) Hake must actually achieve SCSC on both SCR Units at least ten calendar days prior to the respective deadlines shown in Attachment C.

As with any contractual performance, Hake will be deemed to have fulfilled these requirements if it would have done so but for actions of Lurgi which interfered with and prevented their fulfillment. I find that Hake satisfied all three of these requirements.

First, Hake did submit to Lurgi a work schedule (MER 3) which showed Hake achieving SCSC on Units 1 and 2 with ten days positive float. At a meeting in June

2004, Lurgi accepted MER 3 as satisfying that requirement. (Tr. 1348; Hake Ex. 21A).
It is true that MER 3 does not maintain ten days positive float if the SCSC milestone
dates are "constrained." However, § 5.1.1 does not specify that limitation on the work
schedule which Hake must submit. Moreover, that limitation cannot be considered
material to Lurgi, since it promptly issued a master project schedule (MS 13) which
likewise contained no such constraint.

Second, it is undisputed that Hake employed the extended shifts described in
§ 5.1.1.

Third, I find Mr. Wachter's expert opinion — that Hake would have achieved
SCSC on both units ten days ahead of schedule but for the actions of Lurgi (and its other
subcontractors) that prevented it from doing so -- well supported by the record. In this
connection it should be noted that Mr. Wachter's explanation of what is required to
achieve SCSC is consistent with the definition of that term given in § 1.0 of the
Subcontract. Nowhere in the Subcontract is SCSC defined as completing all activities
designated in a Primavera printout as predecessors to SCSC. Such designations depend,
as Mr. Dellers testified, on the interrelationship of activities as entered into Primavera
software by the project schedulers. In this case, the evidence shows that the Lurgi project
schedulers made a number of significant mistakes. Importantly, as Mr. Cash testified,
one major error was designating as sequential certain activities that could have been
performed in parallel. (Cash Depo. at 109-110).

Lurgi points to several internal memos from Ray Klosek in Hake's project control
group. While these memos note, unremarkably, Hake's failure to maintain its initially
projected work schedule, I do not find Klosek's brief comments about what may be
causing the problem entitled to much weight. No evidence was introduced to show that
Klosek had either all the necessary information, or the competence, to make an overall
determination of what was primarily preventing Hake from achieving schedule.

4. Computation of Award

Thus, I find that Hake is entitled to receive $4,453,558 for completion of base contract work, approved lump sum change orders, and § 5.1.1 payment, less the amount already paid by Lurgi, calculated as follows:

| | |
|---|---:|
| 99.7% Completion of Base Work | $28,360,506 |
| § 5.1.1 Payment | $ 1, 598,875 |
| Approved Lump Sum Change Orders | $ 2,427,107 |
| Total Earned | $32,386,488 |
| Less: Payments by Lurgi | $27,932,930 |
| **AMOUNT AWARDED** | $ 4,453,558 |

(Note: Lurgi and Hake agree that Lurgi made payments to Hake totaling $28,317,925. $384,995 of this sum was applied to various T & M invoices and is thus accounted for in Section II.C below.)

B. "Extra Steel"

The parties have a major dispute concerning whether Hake is entitled to be paid $926,209 for the lay down and erection of what it contends is "extra steel," i.e., steel whose erection price was not included in the base price of the contract. The origin of the dispute is an eleventh hour compromise provision added to Attachment K of the Subcontract a day or two before it was signed. That provision reads as follows:

> Structural steel scope is per drawings transmitted through LLNA Transmittal No. 00566, dated 05/06/03, plus an allowance of 20 Tons [for each unit] for "undetailed" access platforms, steps, and landings. Touch-up included. In addition, includes structural steel modifications along Column Line "TE" & "U" for pile driving.

12

Neither side has raised any issues regarding the second and third sentences of this provision. But both have fought bitterly over the meaning of the first sentence. I conclude that this sentence is ambiguous in meaning and that it is thus necessary to consider evidence of the parties' negotiations in order to properly construe it.

Lurgi's RFQ indicated that the project would require the erection of approximately 4,211,000 pounds of steel. Bidders were instructed to use this weight in preparing their lump sum bids.

On February 7, 2003, Hake submitted an initial bid containing a lump sum price for erection of structural steel of $731,399 per unit. As with other bidders, Hake did not specify the weight on which that bid was calculated. As negotiations unfolded, Hake submitted multiple revisions of its bid.

On April 4, 2003, Hake submitted to Lurgi a proposed fix price bid with an overall price of $29,147,498. The pricing sheets transmitted to Lurgi showed that this bid was based on erection of 1,045,700 pounds of structural steel per unit.

On April 29, 2003, Hake submitted a revised bid of $28,450,655 which also indicated that it included erection of 1,045,700 pounds of steel per unit and stated that "these figures are our base bid estimate and remain firm."

On May 6, 2003, Lurgi sent to Hake its Transmittal No. 00566 which contained a large number of drawings, including structural steel drawings (which showed the details of structural steel dimensions and connections) and general arrangement ("GA") drawings (which "illustrate the overall configuration of the SCR process"). (Tr. 1838, 1845, 1848).

In determining the cost of erecting steel, knowing the details of particular pieces and how they are to be connected is important, since it is much more time consuming to weld steel together than to bolt it together. (Tr. 234, 3873). Because details of this kind

were disclosed in the structural steel drawings but not the general arrangement drawings. Hake was willing to commit to a fixed price for erecting the steel shown on the structural steel drawings but was not willing to erect the entire estimated 4,200,000 pounds of steel for that price. This led to an impasse in completing the negotiations. Lurgi was already months behind its expected start date and was eager to finalize a contract with Hake.

On or about May 12, 2003, a meeting was held in an attempt to break the deadlock. Scot Ojard said he had been assured by the Lurgi engineers that the project would require erection of about 4,000,000 pounds of steel and wanted Hake to commit o a firm price for erecting however much steel the project required. David Kazokas said that he could not commit to do that for the $28,450,655 price that was on the table. He said he was willing to go back and prepare a new bid as best he could for 4,200,000 pounds of steel or to erect for $28,450,655 all the steel detailed in the drawing contained in Transmittal 00566.

Ojard had been advised by his project engineers, particularly Ralph Lebron, that 85-90% of the steel was detailed in the 00566 drawings but there would probably be 40 tons more of steel required to complete the project. (Tr. 1841). Thus, Ojard proposed to Kazokas that if Hake would erect all the steel detailed in the 00566 drawings, plus an additional 20 tons on each unit, Hake had a deal. Kazokas looked at his bosses (Mike Bray and Walter MacFarland), who noted agreement, and Kazokas then accepted Ojard's proposal. Thus, the impasse was broken, $28,450,655 became the base contract price specified in § 5.1 of the Subcontract, and the above quoted language was added to Attachment K. Both sides clearly understood that for $28,450,655 Hake would have to erect all the steel shown in "the drawings," plus 20 additional tons per unit, and that, for erecting steel beyond that, Hake would be entitled to be compensated at commercially reasonable rates.

The parties now dispute whether "the drawings" referenced in the Attachment K provision mean all the drawings included in Transmittal No. 00566 or simply the

14

structural steel drawings. For three reasons, I hold that the drawings referenced in that provision encompass only the structural steel drawings within Transmittal 00566:

First, the provision in question contrasts the 20 ton allowance for "undetailed" steel with the base structural steel scope depicted in the 00566 drawings. Steel shown only on the GA drawings is undetailed and thus fits naturally into the former category but not the latter. Although the provision for "undetailed" steel only mentions access platforms, steps, and landings, this is presumably because both sides realized that the vast majority of "undetailed" steel would be of this type, as indeed it is. (Tr. 3898-3899).

Second, the compromise of May 12, 2003 makes no sense if the provision is read to mean every piece of steel "illustrated" in the GA drawings plus 40 tons more. It was precisely that broad commitment which Hake was refusing to take on for "the price on the table."

Third, when the "scope of steel" dispute erupted in early 2004, Rob Cash, who attended the May 12, 2003 meeting, acknowledged in a February 9, 2004 letter (Lurgi Ex. 217) to David Kazokas that the items for which Hake was asserting a right to additional payment "were not shown on the bid drawings" but were added later. From the context, it is clear that he is referring to the 00566 drawings. However, most of the "disputed steel" is shown on the 00566 GA drawings and was only added later to the structural steel drawings.

Lurgi essentially concedes (Tr. 3899-3900) that the items for which Hake now seeks additional payments are not shown on the structural steel drawings in 00566, and I so find based on all the evidence of record. However, Lurgi now urges that Hake was required to erect 4,200,000 pounds of steel for the base price because that number appears in an attachment to Lurgi's RFQ, which is incorporated by reference in Attachment J to the Subcontract. I reject this argument, as it would essentially render the Attachment K provision a nullity and make a mockery of the parties' May 12 compromise. Moreover, as Lurgi recognized in closing argument (Tr. 4026), later

15

documents generally take precedence over earlier documents, and the Attachment K provision was drafted in May, 2003 whereas the RFQ was prepared in January 2003. Lurgi also asserts that the 4,200,000 pound requirement should take priority over the Attachment K provision because of § 2.3 of the Subcontract; however, that section plainly applies to conflicts between "technical requirements," not pricing provisions.

Thus, I find that Hake is entitled to a commercially reasonably price for erecting all steel, in excess of 20 tons per unit, which does not appear on the structural steel drawings in Transmittal No. 00566. In its final brief, Lurgi did not challenge Hake's calculation of the price for erecting such steel. I accept the testimony of David Kazokas and Walter Wachter concerning which items are included within that "extra steel' as well as Hake's pricing calculations which, as noted, were unchallenged in Lurgi's final brief.

I thus award Hake **$926,209 for extra steel.** I note in passing that this award increases by only a bit more than 3% the base price of the Subcontract. ($926,209 divided by $28,450,655 ≈ 0.0325549.)

## C. T & M Work and Disputed LS Change Order

### 1. Amount of the Claim

Because of some unexplained inconsistencies in the parties' earlier calculations concerning T & M billings, I directed each side to submit, post-hearing, a table listing for each T & M the amount invoiced, the amount (if any) paid, and the amount now claimed to be owed. Both parties did so.

The parties agree on the amount paid by Lurgi for T & M work, namely, $384,995. However, the parties differ by approximately $138,000 on what number one gets by adding up all of Hake's T & M invoices. Lurgi's itemization of the amounts which appear on each of Hake's T & M invoices is in accord with Hake's T & M binders

and is therefore accepted as accurate. However, Lurgi's summation of those numbers appears to be erroneous. The total I obtain by doing this addition several times on different calculators is $3,550,410. That is the number I will use as the total of Hake's T & M billing until such time as any party files and serves a request, pursuant to JAMS Comprehensive Arbitration Rule 24(i), for correction of a computational error.

In addition, Hake's final Damage Claim Summary seeks $637,753 for disputed Lump Sum ("LS") change orders. The invoiced amounts of the six LS change order discussed in Hake's final brief (at 52-54) actually add up to $697,915. Because this discrepancy is unexplained by Hake, the smaller number will be treated as the amount of its claims.

It is unclear if Lurgi contends that it has made any payments on these LS change orders. Lurgi's annotated version of Hake's Damages Summary shows a total payment on LS and TM work of $869,629. Of this amount, $384,995 was clearly paid on T & M work. Subtracting $384,995 from $869,629 leaves a balance of $484,634. Lurgi's final brief cites no evidence that it paid this sum to Hake for LS work. Hake asserts that Lurgi's _total_ payments under the contract were $28,317,925, of which $384,995 was attributed to T & M work; the remainder ($27,932,930) has been applied in Section I.A above to reduce the amount owed by Lurgi for Hake's base contract work. I will assume that Lurgi's total payments to Hake do not exceed $28,317,925 unless Lurgi submits a Rule 24(i) request for correction of computational error supported by record citations evidencing such additional payments.

Thus, Hake will be deemed to be claiming $4,188,163 ($3,550,410 + $637,753) for T & M work and disputed LS change orders, less the acknowledged payments of $384,995, leaving a balance of $3,803,168 allegedly owing.

17

## 2. Corrective Work on Expansion Joints 104, 107, 108, 109, and 110

One of the issues that provoked the most intense dispute in this case is whether Hake or Lurgi is responsible for the need to do extensive corrective work on the above expansion joints. On the premise that it is Lurgi's fault, Hake seeks to recover $333,865 for performing the pertinent T & M work. On the premise that it was Hake's fault, Lurgi seeks, in its counterclaims, to recover sums it paid to Papco and sums it claims it will have to pay to other subcontractors whose work was allegedly delayed by the expansion joint rework.

In support of its claim, Hake relies largely on the opinion of its expert witness Walter Wachter that the corrective work was necessitated by design errors that failed to properly account for deflection produced by placement of tons of weight as the GGH was being fully assembled. The persuasiveness of this opinion is diminished by three factors. First, this is the fourth theory Mr. Wachter has advanced to explain the expansion joint problem, the earlier three having been largely discarded. Second, Mr. Wachter had to admit that this theory fails to explain the need for corrective work on Joint 110. Third, Mr. Wachter's analysis was seriously undercut by the expert testimony of Lurgi engineer Ralph Lebron, a quite impressive witness.

To support its claims, Lurgi relies largely on the opinion of Mr. Lebron that the expansion joint problems were due to faulty initial installation of the joints by Hake. While this explanation is possible, it requires me to find that Hake's boilermakers violated basic, commonly understood practices for the installation of such joints. This seems improbable, given that these boilermakers were working under the direction of Bernard Finucan, a very experienced and credible witness, who testified that he was well aware of the need for his workers to take the critical measurements (which Lebron thinks they overlooked) and insured that they did so, and given that Tom Frederick, a knowledgeable and very careful QC director, was monitoring their work. Lebron's assertion of shoddy workmanship is also hard to square with the accolades given these same workers by Howden's A. Pilkington.

18

At this point, I am not convinced that either side has proven precisely what went wrong with the expansion joints. But that level of proof is not the standard applicable to civil claims. Rather, the governing standard is simply preponderance of the evidence, which means in this instance that Hake need only prove that it is more likely than not that the need for corrective work on the expansion joints resulted from causes for which Lurgi, not Hake, was responsible. Considering the evidence as a whole, I conclude that Hake has met that burden. Among the items of evidence which lead me to that conclusion are the following:

- There were significant dimensional problems with a number of the expansion joints supplied by Papco. Joints 102 and 103 could not be installed as delivered and Hake was directed to cut 8-10 inches off the adjacent ductwork to make them fit. Joints 105 and 106 were made to incorrect dimensions and had to be shipped off-site to be repaired. Joints 104 and 107 did not fit properly into the spaces designated for them and Hake was directed (with Papco's consent) to extend the joints by 1.75 inches so they would fit.

- No further problems were observed with any of the expansion joints until the GGH girder and other heavy items were installed, placing tons of weight above certain of the joints. (Rob Cash testified that, had there been a problem with the joints when they were initially installed, he would have reacted immediately.)

- After the placement of all this weight, PSEG, Lurgi, and Hake discovered lateral and axial misalignments in the joints.

- Shortly after this discovery, Papco representatives inspected the joints and rendered a three-page report which "hypothesized" misinstallation by Hake but stated that Papco could not reach final conclusions on the matter until it received certain measurements that it had not been able to take during its visit.

- During one of Papco's site visits, Jim Christianson of Papco stated that Lurgi never provided Papco with the proper lateral dimensions to address expansion joint movement.

19

- Subsequent measurements taken by the Washington Group, a respected consulting firm, confirmed that the previously stretched joints (104 and 107) below the GGH were now compressed and the joints (108 and 109) just above the GGH were stretched.

- At about this time, Scot Ojard told David Kazokas that he (Ojard) had not wanted to use this type of expansion joint on this project because it wasn't flexible and its constructability didn't suit this application but that Lurgi had decided to use it anyway.

- Howden representatives confirmed, for both units, that the GGH flanges were installed by Hake at the proper locations and elevations and that the GGH flange interfaces with the expansion joints were installed by Hake in the correct position and space.

- Mr. Lebron testified that the supporting structure for the GGH was at the proper elevation and within the tolerances required and that the inlet and outlet flanges for the connection to the expansion joints were inserted at the elevations indicated in the drawings.

Accordingly, I conclude that Hake is entitled to be paid appropriate compensation for performing the corrective work on these expansion joints. Lurgi has not challenged Hake's calculation of the amount due on these T & M tickets, and thus they will be allowed in full.

3. RFI No. 81

At the hearing, Lurgi expert Stephen Dellers identified RFI No. 81 as an example (the only one he offered) of instances in which Hake should not be paid for extra work. This RFI involved an incident on August 18, 2003 in which a steel column was "on the hook," ready to be lowered into place and installed, when Hake discovered that the factory baseplate installation was incorrectly rotated by 90 degrees. On August 19, 2003, Lurgi advised Hake that the baseplate had indeed been incorrectly installed by Blazer. Hake was directed to cut off the baseplate and rotate it 90 degrees. Dellers testified that,

20

had Hake properly performed its inspection duties under Subcontract § 3.7, Hake's extra work in connection with this column could have been avoided.

Dellers has a point, but it is overstated. Had the misfabrication been discovered upon delivery instead of "on the hook," the cost of correcting Blazer's error would undoubtedly have been much less.

Thus, I would have made an appropriate reduction in any T & M charges associated with this RFI, had Lurgi pointed them out to me. But it didn't. Neither in its final brief, nor in closing argument, did Lurgi identify any particular T&M associated with RFI No. 81. And Joseph Strum's 34-page "SCCD/Invoice Log," which contains a column for "Hake RFI's Involved," makes no reference to RFI No. 81. Thus, trying to find which, if any, T & M charges Lurgi for work associated with this RFI is like looking for a needle in a haystack. Thus, no deduction from Hake's T & M invoice total will be made on account of RFI No. 81.

### 4. Lurgi's Remaining Objections

Perhaps because the clear preponderance of evidence shows that Hake properly performed the T & M work in question, which was undertaken at Lurgi's direction, Lurgi devotes only half a page (at 22) of its final brief to other challenges to Hake's T & M claim. Those challenges are unpersuasive.

Thus, Lurgi correctly notes that Subcontract § 7.2 requires Hake to undertake work specified in an SCCD pending the parties' agreement on a change order. Hake did this. (With respect to the contention that Hake breached the contract by not immediately complying with Lurgi's no-value SCCD for the erection of disputed steel, see Section III.C hereof.) There is nothing in § 7.2 which states that Hake will not be paid for work performed pursuant to an SCCD or other express direction of Lurgi unless the parties have agreed on the amount of payment before the work is performed. Mr. Ojard testified that, due to the pace of the project, it was often necessary for the paperwork to catch up

after work was done. To the extent that Mr. Cash's August 15, 2003 letter can be construed as a subcontract amendment (which is doubtful) or at least a reflection of the parties' pattern of operations, that letter requires Lurgi to respond promptly to requests by Hake to increase the amount of any SCCD. Lurgi was not entitled, legally or equitably, to sit on such requests from Hake, accept the benefit of the extra work Hake performed, and then refuse to make payment on the grounds of lack of prior approval.

Lurgi also argues that Hake may not collect on invoices submitted after the work was performed in view of Subcontract § 8.3.4 that states "Subcontractor expressly waives the right to assert any claims for the first time after completion of the Work." However, asserting a claim and submitting an invoice are not the same thing. Hake clearly and repeatedly asserted, long before its work was completed, the right to be fairly compensated for work, outside of Hake's base scope, that Lurgi directed it to perform.

Even if Hake did not have a contractual right to be paid for the subject T & M and LS work -- as it clearly does -- it would still be entitled to fair compensation under the doctrine of *quantum meruit*. While this doctrine is typically applied to owners who receive some benefit from a claimant's work, it is not restricted to that application. Here, PSEG received no benefit from having Hake correct mistakes for which other subcontractors were responsible; such work did not change what Lurgi was already contractually bound to deliver to PSEG under the prime contract. Rather, the beneficiary of Hake's T & M work was Lurgi, since it was undertaken in order to effect compliance with the PSEG contract and thus entitle Lurgi to receive its full contract payment. Having directed Hake to perform this T & M work and accepted the benefit of it, Lurgi is required to compensate Hake for the fair value thereof.

Finally, although not mentioned in its final brief, Lurgi asserted in August 2004 correspondence that some of Hake's T & M work was within Hake's basic scope and that some charges were excessive in amount. The evidence at the hearing, particularly the testimony of David Kazokas, demonstrates that the T & M work was not within Hake's

22

basic scope and was fairly priced. Mr. Strum's testimony to the contrary was unpersuasive and is rejected.

### 5. Conclusion

For reasons set forth above, Hake is awarded the full amount of unpaid invoices for T & M and LS work in the amount of **$3,803,168.**


### D. Interest

Pursuant to Subcontract §§ 6.1.2, 6.1.3, and 6.1.4, Hake invoices submitted by the 25th day of each month were to be paid by Lurgi by the 7th calendar day of the following month and, if not so paid, bear interest from that date at the rate of 1% per month. Thus, Hake is entitled to receive such interest on the contract payments awarded in Sections II.A, II.B, and II.C above.

In the interest calculations it submitted, Hake began the running of all interest on July 7, 2004 rather than on the 7th day following the month in which each individual invoice was submitted. This arrangement is favorable to Lurgi, since a greater portion of the sums awarded were invoiced from the start of the project through June, 2004 rather than thereafter. Thus, I will use July 7, 2004 as the start date for the running of interest.

Hake's interest calculation also compounds interest each month. It is highly unusual to compound interest twelve times per year. In the absence of any language in the contract suggesting that interest is to be compounded in that or any other fashion, Hake will be awarded simple interest at the rate of 1% per month (i.e., 1/30th of 1% per day) from July 7, 2004 until paid. Thus, for example, if Lurgi were to make full payment of the award herein on March 17, 2006 (i.e., 20 months and 10 days after July 7, 2004), Hake would be entitled to receive the principal sum awarded for contract payments ($9,182,935) plus 20.33% interest thereon ($1,866,891),

## E. Sales Tax

Hake claims that, pursuant to Subcontract § 5.2, Lurgi is required to reimburse Hake for sales taxes in the amount of $332, 779. In its final brief, Lurgi acknowledges (at 25) that it is obligated to pay such sales taxes on items not exempted by the PSEG tax exemption and not relating to labor, if Hake provides adequate documentation that it has paid such taxes.

Lurgi appears to concede that Hake has provided adequate documentation since, on its annotated version of Hake's Damages Summary, Lurgi shows $332,779 owing to Hake for sales taxes. In any event, I find that Hake has provided adequate documentation (Hake Exs. 50, 152; Tr. 2842, 2917) and therefore award Hake **$332,779** for sales taxes.

## F. Cost of Acceleration

### 1. Background of the Claim

It is undisputed that, from November 15, 2003 through March 31, 2004, **Hake** crews worked nineteen weekends at overtime (Saturdays) or double time (Sundays) labor rates. Hake gave Lurgi notice on November 14, 2003 that it would be thus "accelerating" its work schedule. Hake contends that the principal factor necessitating this acceleration was the extra work Lurgi was asking it to perform as well as the design errors, fabrication errors, and late deliveries which plagued the job throughout. It claims that, under Subcontract § 8.4, it is entitled to "additional compensation for demonstrated damages" it incurred in responding to these added demands on its schedule.

Both Mr. Cash and Mr. Pavlosky testified that, given the circumstances in November, Hake had good cause to accelerate, and I find that conclusion is supported by the preponderance of the evidence. I also find that, under § 8.4, having sought and been denied schedule extensions, Hake is entitled to additional compensation for this weekend

24

work. However, bad weather, holidays, and other factors were also responsible for the need to work weekends. Thus, Hake must make a reasonable apportionment of the weekend costs. Mr. Wachter has attributed 61% of the weekend costs to Lurgi, and I find that to be a reasonable apportionment.

To recover on its acceleration claim, Hake must not only prove entitlement but must also prove the amount of its damages with reasonable certainty. Under Maryland law, as elsewhere, damages may not be based on speculation or conjecture. Thus, it is necessary to see whether Hake has proven, with reasonable certainty, the various components of its acceleration claim.

### 2. Premium Labor Rates

Hake claims $693,249 for the difference between straight time labor rates and weekend rates. However, as Mr. Dellers explained (Tr. 3547-3551), Hake was already working 50-hour weeks Monday-Friday. Dellers testified that this means the Hake claim for premium differential is overstated by approximately 10%. Mr. Wachter replied that the figure is actually 7% but did not explain the basis of that calculation. Since Hake has the burden of proof on this claim, I will accept the Dellers figure and reduce Hake's recovery to $623,924 (90% of $693, 249).

### 2. Loss of Productivity

Hake claims $1,170,080 for "loss of productivity" resulting from working extended weeks: $397,443 for loss of productivity on weekends and $772,637 for loss of productivity Monday through Fridays. However, I conclude that recovery of these alleged damages is barred by Subcontract § 26.1 which expressly excludes liability of either party for "loss of production."

Even if this claim were not barred, Hake has failed to prove it with reasonable certainty. As Mr. Dellers noted, Mr. Wachter's calculations assume that Hake crews

25

were working more than 60 hours per week after November 14, 2003. In fact, Hake's records show that very few of its employees worked more than 60 hours per week; indeed, more worked less than 50 hours than worked in excess of 60. (Tr. 3553). Moreover, numerous errors in Mr. Wachter's methodology (Tr. 3554-3572) demonstrate that the loss of productivity has not been properly calculated and cannot be determined with reasonable certainty from his report. Thus, recovery for this element of the acceleration claim will not be allowed.

### 4. Subcontractor Overtime and Equipment Costs

Hake seeks to recover $178,843 for the costs of having two large cranes and their crews working on the weekends. Rather than using actual records of when the cranes were utilized, Hake's calculations assume they were both utilized on all the weekend days. However, Hake's Daily Force Reports show that as of February 6, 2004, one of the cranes had been demobilized. (Tr. 3576). In his testimony, Mr. Wachter did not explain how many of the weekend days prior to February 6 Hake attributes to Lurgi and how many to other factors. Thus, the allowance for this element will be reduced by 50% to $89,422.

### 5. Site Safety and Clerk Staff

Hake seeks to recover $48,353 for site safety and clerk staff on weekends. However, unlike the other acceleration claims, Hake failed to reduce this one by 39%. (Tr. 3581). Thus, Hake will be awarded only $29,495 (61% of $48,353).

### 6. Markup

Hake seeks $28,615 for "subcontractor markup." However, Hake's markup calculations for these costs entail an element of double counting, since they are derived

26

from T & M rates which already include a 16% markup. (Tr. 3581). As Hake has failed to show with reasonable certainty what the correct markup figure should be, none will be awarded.

### 7. Conclusion

Based on the determinations set forth above, Hake will be awarded the following sums on its acceleration claim:

| | |
|---|---|
| Premium Labor Rates for Saturdays and Sundays | $623,924 |
| Subcontractor Overtime and Equipment | $ 89,422 |
| Site Safety and Clerk Staff | $ 29,495 |
| **TOTAL ACCELERATION AWARD** | **$742,841** |

### G. Impact Associated With Changes

Hake seeks to recover $824,874 for productivity impacts allegedly associated with the change orders. Again, I conclude that this claim is barred by the exclusion of liability for "loss of production" set forth in Subcontract § 26.1. Moreover, the numerous methodological flaws described by Mr. Dellers (Tr. 3581-3599) demonstrate that Hake has not proven with reasonable certainty the amount of damages it actually experienced in this regard. Thus, this claim is denied.

### H. Costs for Extended Time of Performance

Hake seeks to recover $1,312,493 for "damages associated with having to be on the Project site 60 days due to Project delays that were all attributable to Lurgi." (Hake Final Brief at 59; Hake final Damages Summary). The critical underpinning of this claim is the opinion of Mr. Wachter that, but for the delays attributable to Lurgi, Hake would have been off site by April 1, 2004. I find that this opinion is contrary to the preponderance of the evidence, and I do not accept it.

All parties recognized, even before the Subcontract was signed, that the time frame for completing this work was very tight. As negotiations between Hake and Lurgi dragged on in the spring of 2003, the start date for Hake's performance was delayed by approximately two months while the end date remained fixed. This schedule compression made Mr. Kazokas feel justifiably "pinched."

Once work began, there were delays attributable to weather and other factors. Even without the delays attributable to Lurgi, it would have taken a heroic effort by Hake to depart the site by April 1, 2004. Hake's final milestone date was April 24, 2004. Although I accept Mr. Wachter's opinion that, absent Lurgi's delays, Hake could have met this deadline, I conclude that Hake would have then been on site for sometime thereafter doing "punch work." While it may be that, without Lurgi-caused delays, Hake's site costs in April and May 2004 would have been less than they actually were, the extent of that difference has not been proven by Hake and thus remains wholly speculative. Thus, no recovery for this claim will be allowed.

### I.  Summary of Amounts Awarded To Hake

**1.  Contract Payments**

| | |
|---|---|
| (a) Balance Owed for Contract Price and Approved LS | $ 4,453,558 |
| (b) Erection of Extra Steel | $ 926,209 |
| (c) T & M and Disputed Lump Sum Orders | $ 3,803, 168 |
| **Total Contract Payments** | $ 9,182,935 |

**2.  Sales Taxes** $   332,779

**3.  Acceleration Damages** $   742,841

**TOTAL AWARD** $10,258,555

(With Simple Interest, on Contract Payments Only, of 1% per month from July 7, 2004 until paid.)

### III. LURGI'S CLAIMS

#### A. Correction of Defective Work

##### 1. Structural Steel Installation

Lurgi seeks to recover $817,602 from Hake, on grounds that it was back charged this amount by PSEG "for charges associated with the structural steel punch list items Hake was obligated to complete under the contract." (Lurgi Final Brief at 19; Finding of Fact 166). However, Lurgi's brief does not identify evidence of any such back charge. Rather, it cites to a punch list prepared by LLNA employee Chuck Blake "at some point toward the end of May," 2004, from which LLNA estimator Craig Deppen prepared an estimate of the costs to accomplish such work. Neither Blake, nor Deppen testified at the hearing, so I had no opportunity to evaluate their credibility or competence.

Moreover, as Deepen's July 23, 2004 memorandum acknowledges, there were a number of problems associated with preparing this estimate, including "many duplications' on the punch list and the fact that various items on the punch list were corrected in the last few days on the project but not removed from the list. (Lurgi Ex. 475 at 1). While Deepen says he tried to remedy these problems with the list, there is no evidence of how successful he was.

As noted earlier, damages must be proven with reasonable certainty and may not be conjectural or speculative. Lurgi's proof of this claim does not meet that standard, and thus nothing will be awarded on it.

##### 2. Expansion Joints

Lurgi claims $90,682 paid to Papco in connection with expansion joint repairs. This item must be disallowed, since I have concluded that the need to repair the expansion joints was more likely the responsibility of Lurgi than Hake.

29

## B. Liquidated Damages

Lurgi seeks to recover from Hake $1,000,000, under Subcontract § 8.5, for failure of Hake to achieve the SCSC and Substantial Completion milestones in Attachment C. To prevail on this claim, Lurgi must prove (1) that liquidated damages are payable by Lurgi to PSEG for these delays (§ 8.5.4), and (2) that the delays were caused by Hake (§ 8.5.1). Lurgi has identified no evidence of the first element but I will assume *arguendo* that PSEG has or will assess liquidated damages against Lurgi on this account. However, Lurgi has failed to prove the second element. Indeed, as noted above, I have accepted Mr. Wachter's expert opinion that, but for Lurgi's prevention of its performance, Hake would have met these contractual milestones. Accordingly, this claim by Lurgi is denied.

## C. Removed Scope Performed by Enerfab

Lurgi argues that by refusing for 41 days to erect the steel which Hake claimed was extra, Hake breached Subcontract § 25.1.4, which authorizes Lurgi to initially decide any unresolved dispute, in order to minimize project delays, with final determination to be made through later arbitration. However, by its terms, § 25.1.4 comes into play only for disputes not resolved through the procedures of §§ 25.1.1, 25.1.2, and 25.1.3. These provisions provide for consultation between the parties at successive levels of seniority. David Kazokas testified credibly that he tried repeatedly to get Lurgi representatives to participate in such consultations but was repeatedly put off and rebuffed. Having failed to prove that it participated in these consultative predicates, Lurgi has not shown that it was entitled to invoke § 25.1.4. Moreover, after Lurgi issued its directive SCCD on February 12, 2004, Hake did erect the disputed steel under protest, although it did not begin doing so immediately.

Even if Hake's conduct in this matter constituted a breach (which it did not), Lurgi has not proven that it suffered any damages. Since I have found that erection of this extra steel was outside the base scope and required additional compensation, Lurgi

could only prove damages by showing that it cost more to get Enerfab to erect the steel than Hake would have charged for the same work. Lurgi has not even attempted to make such a showing. Moreover, the evidence shows that about half the steel erected by Enerfab was wholly unrelated to Hake's contract.

In closing argument, Lurgi's counsel noted that, if I found against Lurgi on the scope of steel issue (as I have done), then Lurgi's claim for removed scope performed by Enerfab "fails." (Tr. 4085). That is correct.

## D. Additional Costs of Lurgi Subcontractors Due to Hake

Lurgi seeks to recover $3,824,655 for "additional costs of Lurgi subcontractors due to Hake." According to Lurgi's counsel, the root cause of these delays was the need to rework the expansion joints; thus, if the expansion joint issue were decided against Lurgi, then Lurgi would lose on this claim as well. (Tr. 4017, 4085). That observation is well founded. Given my determination that responsibility for the expansion joint rework rests with Lurgi, and in the absence of any persuasive evidence that Hake otherwise delayed other subcontractors, Lurgi is not entitled to any recovery on this claim, even if it had proven (which it has not) that Lurgi will be required to reimburse all these subcontractor in the amounts shown on Lurgi's damages summary.

## E. Additional Lurgi Costs

### 1. Uncompleted Hake Scope

Lurgi asserts that it "was required to pay $624,455 to PSEG for items within the scope of its contract with Hake that Hake did not complete." (Lurgi Final Brief at 19; Findings of Fact 167). As support for this claim, Lurgi cites Lurgi Exhibit 489 and Tr. 2254-2256. However, the cited evidence does not show that Lurgi paid anything to PSEG. Rather, Exhibit 489 consists of a one half page estimate, without any supporting documentation. The cited transcript pages consist of testimony by Mr. Ojard that this

31

document was prepared by Lurgi Estimator Craig Deppen to estimate the cost of completing the portion of Hake's work that had not yet been completed when Lurgi was removed from the project. There is no evidence before me of how Mr. Deepen came up with his brief estimate. How much, if anything, Lurgi will ever be required to pay to PSEG for this work is at present totally speculative. Thus, this claim is denied.

### 2. GGH Bearing Replacement (Unit 2)

Lurgi seeks to recover from Hake $425,000 for the "estimated" charge which it anticipates PSEG may at some future time assert against Lurgi in connection with possible repair or replacement of the GGH bearing on Unit 2. This claim is denied on two grounds. First, it is totally speculative. More than eighteen months after Lurgi was thrown off the job, PSEG has yet to assert any such charge. (Tr. 2257). Second, the cause of the bearing problem, if there be one, has not been established. Mr. Ojard testified that it could be the product of a Howden manufacturing defect. (Tr. 1944).

### F. Recovery of Unearned Float Payment

Finally, Lurgi seeks to recover $1,395,296 of advance payments to Hake for the "float" payment provided in Subcontract § 5.1. Since I have found that Hake earned this payment, Lurgi's claim for a partial refund fails.

## IV. ATTORNEY'S FEES AND COSTS

Hake seeks an award of attorney's fees and costs, noting that Md. Code Ann. Real Property §§ 9-301 *et seq* (2005) permits such an award upon a determination that "an owner, contractor, or subcontractor has acted in bad faith by failing to pay undisputed amounts owed...." (§ 9-303(b)). In this proceeding, while Lurgi acknowledged owing Hake approximately $3,358,000 under the contract, it also asserted that it had contract

claims against Hake which greatly exceeded this amount. Thus, Lurgi disputed owing Hake anything after the opposing claims were netted out.

Moreover, while there is evidence that Lurgi's conduct sometimes bordered on bad faith, e.g., Lance Risinger's instruction to Rob Cash that he should deny all late delivery claims regardless of their merits (Cash Depo. at 87-89), Lurgi's position on several major issues in this case (i.e., extra steel, expansion joints, and float payment), while ultimately unsuccessful, were not frivolous. And it prevailed on most of Hake's "Impact" claims.

Accordingly, I find that Hake has not established an entitlement to attorney's fees and cost under the foregoing Maryland statute. However, that does not end the matter.

As Lurgi observed in its final brief (at 24), Subcontract § 25.10 grants the arbitrator discretion to award "costs, charges and expenses, including attorney's fees, expert fees, costs of personal assistance, filing fees, deposition and photocopying expenses" as well as charges of the arbitrator and of JAMS. The Subcontract sets forth no guidelines for the exercise of this discretion. In order not to be mere surplusage, this provision must contemplate some situations that Maryland Code § 9-303(b) does not reach. While it is not necessary to catalog every circumstance in which the invocation of this discretionary authority may be warranted, I am convinced that the instant case presents one such situation.

In this case, Lurgi chose, as a minimum, to play "hard ball" by withholding over three million dollars it admittedly owed Hake, setting forth a collection of flimsily supported counterclaims, and then fighting Hake on every single issue. This was a high risk strategy for Lurgi, as it drove up the costs for both sides considerably and exposed Lurgi to the possibility of an attorney's fee award if Hake substantially prevailed. And Hake did. Given that Hake was seeking to recover $14,345,993 and defeat Lurgi claims of $10,172,035, the amount at play in this arbitration was $24,518,028. By defeating all of Lurgi's claims and recovering approximately $12,125,446 (assuming the hypothetical

33

interest recovery described in Section II.D) on its own claims, Hake won on $22,297,481 (about 91%) of the dollars at issue. Given this overwhelming victory by Hake in a hard-fought arbitration made especially expensive by Lurgi's tactics, I conclude that Hake should receive reimbursement of its reasonable and necessary costs of the sort identified in Subcontract § 25.10, and I so award, subject to determination of the quantum pursuant to the procedures set forth in Section VI hereof.

## V. **AWARD**

For all the reasons set forth above, I hereby award and adjudge as follows:

1. On its claim for contact payments, Hake shall recover of Lurgi $9,182,935 plus simple interest at the rate of 1% per month from July 7, 2004 until paid.

2. On its claim for sales taxes, Hake shall recover of Lurgi $332,779.

3. On its claim for acceleration costs, Hake shall recover of Lurgi $742,841.

4. On its claims for extended time of performance and impact associated with changes, Hake shall recover nothing.

5. On its claims against Hake, Lurgi shall recover nothing.

6. Hake is awarded reasonable and necessary costs as described in Subcontract § 25.10, the amount of which shall be determined as set forth in Section VI hereof.

## VI. <u>FURTHER PROCEEDINGS</u>

1. On or before January 17, 2006, Hake shall file and serve an itemized statement of the attorney's fees and other costs it is seeking, together with detailed documentation thereof, and affidavits or other proof of the reasonableness of such fees and costs.

2. On or before February 7, 2006, Lurgi shall file and serve any objections it may have to Hake's recovery of the sums sought together with affidavits or other evidence regarding any fees and costs claimed to be unreasonable in amount,

3. If I deem it necessary to hold an argument or evidentiary hearing in order to properly determine the amount to be awarded Hake for fees and costs, I shall promptly schedule one.

4. After the foregoing submissions have been made, and any argument or hearing deemed necessary has been held, I will issue a FINAL AWARD which shall incorporate the provisions of this Interim Award and include the amount of attorney's fees and other costs awarded to Hake.


December 22, 2006                          Arbitrator Curtis E. von Kann


35

## PROOF OF SERVICE BY FACSIMILE & U.S. MAIL

I, Stacey L. Harrison, not a party to the within action, hereby declare that on December 27, 2005 I served the attached INTERIM AWARD on the parties in the within action by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Washington, DISTRICT OF COLUMBIA, addressed as follows:

Angelo A. Stio Esq.
Pepper Hamilton, LLP
300 Alexander Park, CN 5276
Princeton, NJ 08543-5276 USA

Jonathan M. Preziosi Esq.
Pepper Hamilton, LLP
300 Alexander Park, CN 5276
Princeton, NJ 08543-5276 USA

Kevin M. Hart Esq.
Stark & Stark
993 Lenox Dr.
Building Two
Lawrenceville, NJ 08648

I declare under penalty of perjury the foregoing to be true and correct. Executed at Washington, DISTRICT OF COLUMBIA on December 27, 2005.

Stacey L. Harrison