IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALLIED ENVIRONMENTAL SOLUTIONS, INC., formerly known as, Lurgi Lentjes North America, Inc. 9730 Patuxent Woods Drive, Suite 100 Columbia, Maryland 21046-1626, <br><br>    Petitioner, <br><br> v. <br><br> FRANK W. HAKE, INC., 1500 Chester Pike Eddystone, Pennsylvania 19022, <br><br>    Respondent. | Civil Action No. |

## DECLARATION OF KEVIN M. HART

I, Kevin M. Hart, declare as follows:

1. I have been an attorney at law in the State of New Jersey since 1978, and I am a shareholder of Stark & Stark, P.C., attorneys for the Petitioner, Allied Environmental Solutions, Inc. (formerly known as Lurgi Lentjes North America, Inc. ("Lurgi")).

2. I am fully familiar with the facts that are set forth herein.

3. I served as lead trial counsel in a sixteen-day arbitration between Lurgi and Frank W. Hake, Inc. ("Hake"), conducted under the auspices of JAMS. Evidentiary hearings were held on September 19, 20, 26, 27, 28, 29 and 30; October 4, 5, 6 and 7; and November 18, 19, 20, 21 and 22.

### The Huge Record

4. This matter involves a dispute involving a subcontract between Hake and Lurgi regarding the construction of two selective catalytic reactor systems at a PSEG facility located in

Hamilton Township, New Jersey. As the principal subcontractor to Lurgi, Hake was to perform all work necessary to complete the civil, engineering, structural and mechanical work under the general direction of Lurgi. The dollar amount of the contract between Lurgi and Hake was approximately $29 million.

5. While the formal controversy began as a mechanic's lien claim by Hake for less than $600,000, it has grown into an arbitrated dispute involving millions of dollars in claims by by Hake and counterclaims by Lurgi. As I discovered after I became involved in this matter, the project record involved several million pages of documents and the testimony of numerous witnesses. The parties had designated tens of thousands of pages of exhibits prior to my involvement for Lurgi.

6. As the Arbitrator found in his Interim Award: "The record in this case is huge, consisting of more than 4,000 pages of testimony and tens of thousands of pages of project records." Interim Award at 2.

## My Initial Involvement Did Not Occur Until September 2005

7. My first involvement with this matter did not occur until August 31, 2005 at about 7:30 p.m., after I was requested by Lewis J. Pepperman, Esq., the managing partner of Stark & Stark, P.C., to assume the role of lead counsel in this matter replacing Craig S. Hilliard, Esq., also a shareholder at Stark & Stark.

8. Prior to September 2005, I had had no involvement in this or any other matter representing Lurgi and I had no substantive knowledge of the client, the dispute with Hake, the PSEG project, or any of the underlying claims or facts. I had not met any of the witnesses or experts, nor had I reviewed any of the documents involved in this matter.

9. During a conversation on August 31, 2005, Mr. Pepperman advised me that Mr. Hilliard was taking a sudden and unexpected leave of absence from the firm and had been

relieved of all of his responsibilities. Mr. Pepperman did not have a timetable for when, or even if, Mr. Hilliard would return to the practice of law.

10. At the time we had this discussion, it was Mr. Pepperman's understanding that the arbitration hearings were tentatively scheduled to begin on September 8, 2005. We discussed making an application for a postponement to allow me to begin to review the documents, to become familiar with the case, to work with the witnesses, and to work with the expert witness and consultant hired by Lurgi for the case.

11. The day following Mr. Hilliard's withdrawal from the practice of law, on September 1, 2005, a telephone conference was scheduled with the arbitrator, the Honorable Curtis E. von Kann, as well as counsel for Hake. It was my understanding that, during that conference call, Mr. Pepperman advised Judge von Kann of the problems concerning Mr. Hilliard and made a request for a postponement.

**Lurgi's Requested Postponement Was Denied**

12. As a result of the telephone conference, Judge von Kann issued Order No. 6, granting a minor adjournment of the hearing dates from September 8 to September 19, 2005. Order No. 6 at 9.

13. Judge von Kann also noted that the arbitration was "hotly contested." Order No. 6 at 1. In his Interim Award of December 27, 2005, Judge von Kann recognized that the "record in this case is huge, consisting of more than 4,000 pages of testimony and tens of thousands of pages of project records." Interim Award at 2.

14. Judge von Kann's description of the record put before him, however, does not begin to describe the scope of the documentary record in the case. If the arbitration record was huge, the documentary record was enormous, comprising almost a million pages of documents and the testimony or potential testimony of more than a score of individuals with personal

3

knowledge of the facts involved in this complex and technologically advanced construction project.

15. Beyond the sheer size of the documentary record, the scope of claims asserted by Hake were changing and were diverse. Hake presented a series of unique, but at times interrelated, claims — each of which required specific technical and scientific knowledge on various aspects of the project.

16. Lurgi also asserted a series of counterclaims against Hake in an approximate amount of $14 million that, in many respects, were independent of each other and involved a large scope of discrete issues.

17. At the time I undertook the task of becoming familiar with the matter, I was under the impression that Lurgi had retained the services of HDH Engineering, and, more specifically, Willis Hembree, who had prepared and submitted an expert report on Lurgi's behalf. Mr. Hembree's role in this matter, however, went beyond just potential testimony as an expert witness. Mr. Hembree was the person on the Lurgi side most familiar with the voluminous documents involved on the project, and in particular I learned that he had personally taken the lead in reviewing Hake's huge document production of more than 100 boxes plus electronic documents. Not only was he familiar with these documents, but had personally studied and analyzed them. Moreover, he had developed an extensive knowledge and understanding of the complex scheduling issues involved in the project, as well as various other matters.

18. Thus, when I agreed to accept this new assignment, I was counting on Mr. Hembree's daily and active attendance at the arbitration as the person most knowledgeable of the documents, facts, claims, and issues in this case on the Lurgi side. I anticipated that, just as I discovered Mr. Hembree had done in connection with the depositions taken in the matter, he

would be involved in the preparation of the witnesses for their testimony and, in particular, would actively assist me in preparing the cross-examination of the Hake witnesses. I was particularly counting on having Mr. Hembree present as I cross-examined the witnesses so that he could advise and consult with me on a real time basis during the cross-examination. Finally, I was planning on using Mr. Hembree's detailed and unique knowledge of the documents to assist in the selection and use of documents as exhibits with each of the witnesses that would testify during the proceedings.

## Lurgi's Presentation Of Its Claims And Defenses Was Compromised By The Lack Of Time Allowed By the Arbitrator

19. Pursuant to the provisions of Order No. 6 and the September 19, 2005, commencement date, I was essentially given a total of eighteen days (including the Labor Day holiday weekend) to review and analyze approximately 500 large boxes of hard copy and electronic documents (the universe of documents from both sides), that included approximately fourteen full days of deposition transcripts, expert reports and other various materials.

20. To document our request for a postponement and our participation in the hearing only under protest, we sent the arbitrator a letter of protest on September 16, 2005 describing the prejudice that would arise from forcing Lurgi to proceed with the hearing as scheduled. At the September 19, 2005 hearing, I confirmed that the letter would be made a part of the record in the proceedings. *Id.* at 26. That letter is attached to this declaration as Exhibit A.

21. This case involved complex facts and issues with extensive testimony by various fact witnesses regarding engineering specifications and other complex construction issues. Of the seven fact witnesses that were presented by Lurgi during the arbitration hearing, I prepared each one of them for the testimony on one evening just prior to their respective testimony.

22. Based on my review of the billing records submitted by opposing counsel in

connection with their fee request, I now know that counsel for Hake had been personally working on this matter since early 2004 — a period of over **eighteen months** prior to the hearing. Specifically, Hake's trial counsel, Pepper Hamilton P.C., was retained and involved in an investigation of this project as early as March of 2004 — while the project was still underway and at the time Hake filed its lien claim for less than $600,000. Similarly, Hake's expert, Walter Wachter, was also retained by Hake and began providing services relating to this project in March of 2004.

### Mr. Hembree With His Unique Knowledge Became Unavailable

23. Approximately four days prior to the start of the hearings, I was advised that Mr. Hembree had suffered a cardiac incident on the same day that he was to travel to my office to be prepared for his deposition. This was a stunning development that ultimately was a devastating blow for the Lurgi side. We faced the loss of the person with the most – and unique – knowledge of the documents, facts, and issues for the Lurgi side.

24. As the arbitrator recognized, experts are exempt from the sequestration rule, as "they are supposed to absorb all the pertinent facts." Tr., 9-19-05 at 68. Not only was Mr. Hembree (and eventually Mr. Dellers, his forced replacement, who only arrived at the end of the hearings) not able to absorb all of the pertinent facts, Mr. Hembree was completely unavailable to work with me during the hearings in his anticipated and unique role.

25. Ultimately it was determined that Mr. Hembree was unable to participate in the hearings, and was further unable to provide me any assistance whatsoever, as his doctor's orders were that he was not allowed to deal with any matters that could cause stress. Specifically, Mr. Hembree was directed not to have any discussions with counsel on this matter due to potential health problems that it was anticipated it would cause for him.

26. After I began working on the matter, I was unable to discuss the matter with Mr.

Hilliard due to his medical situation. Therefore, at the time the hearings commenced on September 19, 2005, I had reviewed documents but I had no meaningful discussions with either Mr. Hilliard or Mr. Hembree.

27. The hearings commenced on September 19 and, due to the unavailability of Mr. Hembree, and the lack of any other person that could substitute for him from HDH, I did not have the benefit of any expert participation during the hearing from September 19 through October 7.

28. While Mr. Hembree's report did not cover all of the areas that were addressed by Hake's expert, Walter Wachter, Mr. Hembree was the person most familiar with evidence concerning the crucial issues of the case, such as the excess steel claim, expansion joints and scheduling issues, all of which were testified to by Mr. Wachter.

29. Without the benefit of Mr. Hembree's participation, I was at a substantial disadvantage. I was denied the services of Mr. Hembree (Mr. Wachter's counterpart), who was the most knowledgeable person with respect to various crucial aspects of the project.

30. As I advised the arbitrator on September 28, 2005, during a discussion of alternatives to having Mr. Hembree participate: "I don't believe it's feasible, and I think it's prejudicial to my client to have an expert step into a matter like this in the type of timeframe Your Honor has set forth," and "I think that the prejudice to Lurgi by having to go forward at less than full strength with an expert, regardless of timeframe…substantially prejudices our case." Tr., 9-28-05 at 1425 & 1440.

31. I further noted to the arbitrator at the time that Hake's financial considerations — as discussed in detail in the declaration of Mr. Schrama — and the scheduling concerns of the arbitrator did not relate to the presentation of this case, in contrast to Lurgi's expert problem and

Mr. Hilliard's medical situation. The prejudice to Lurgi significantly outweighed any purported prejudice to Hake's finances. Nevertheless, no postponement sufficient to allow Mr. Hembree to participate himself was granted.

### Lurgi Was Prejudiced

32.     Mr. Hembree's unavailability resulted in a loss to Lurgi of Mr. Hembree's unique knowledge and familiarity with the record, facts, and issues. His replacement, Steve Dellers, was given a fraction of the time allowed to Hake's expert to prepare. Hake's expert began working on this project in March 2004 — eighteen months before the hearings. Mr. Dellers' first significant involvement as a potential testifying expert did not occur until October 2005, with his testimony being presented just a few weeks later in November 2005.

33.     Contrary to Mr. Wachter, who had provided expert support to counsel for Hake from the beginning of this dispute in March 2004 and specifically at the hearings beginning on the hearing date and throughout the factual presentation of the case, Mr. Dellers was unavailable to do so to Lurgi's severe detriment.

34.     The prejudice to Lurgi is evident from the Arbitrator's Interim Award that stated: "The record in this case is huge, consisting of more than 4,000 pages of testimony and tens of thousands of pages of project records. In that context it is incumbent upon counsel to direct my attention to those parts of the record that allegedly support their contentions; it is neither appropriate nor feasible for me to search the record to see if I can find any support for such contentions." Interim Award at 2.

35.     Copies of the pages of the transcript from the arbitration hearing referenced in this declaration are attached as Exhibit B.

Pursuant to 28 U.S.C. § 1746, I declare under the penalties of perjury that the foregoing declaration is true and correct.

Executed on: 2/10/06

_____
Kevin M. Hart

# EXHIBIT A

# STARK & STARK
A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

KEVIN M. HART
DIRECT DIAL NUMBER
609-895-7334
DIRECT FAX NUMBER
609-895-7395
E-MAIL
khart@stark-stark.com

OFFICE: 993 LENOX DRIVE LAWRENCEVILLE, NJ 08648-2389

MAILING: PO BOX 5315 PRINCETON, NJ 08543-5315

609-896-9060 (PHONE)   609-896-0629 (FAX)

WWW.STARK-STARK.COM

September 16, 2005

**VIA E-MAIL ONLY**

Honorable Curtis E. von Kann
JAMS
555 13th Street, NW
Suite 400 West
Washington, DC 20004

Re: **Frank W. Hake, Inc. v. Lurgi Lentjes North America, Inc.**
**JAMS Arbitration No. 1410003829**

Dear Judge von Kann:

As I previously advised, the undersigned has assumed the role of lead counsel in the above-captioned matter, replacing my partner Craig S. Hilliard, Esquire, on behalf of Lurgi Lentjes North America, Inc. ("Lurgi").

The purpose of this letter is to first place on the record certain objections made on behalf of Lurgi in response to rulings made by Your Honor, as set forth in ORDER NO. 6. ORDER NO. 6 was issued by Your Honor on September 2, 2005, as a result of a telephone conference between the parties in which a request was made by this firm on behalf of Lurgi for an adjournment of the proceeding based upon a medical emergency that had arisen with respect to Mr. Hilliard. As set forth in Your Honor's Order, on August 31, 2005, Mr. Hilliard was forced to take an emergency medical leave of absence from all his cases and other responsibilities at Stark & Stark, P.C., which include representing Lurgi in this matter. We pointed out that Mr. Hilliard has been the lead counsel for Lurgi in this arbitration from its inception and has continuously been involved in all aspects of the case, including fact development and other discovery, legal strategy, witness preparation, hearing tactics and the like. At the time of his emergency medical leave, he was actively preparing to represent Lurgi at the evidentiary hearing before Your Honor.

Mr. Hilliard continues to be on medical leave and there is no projected date for his return. As such, Mr. Hilliard will be unable to participate in the arbitration hearing in any meaningful way, and despite having been the lead attorney on the case for almost a year, he has not been actively involved at this most critical time of case preparation. Based upon Mr. Hilliard's medical condition, and its

PRINCETON   •   PHILADELPHIA   •   CHERRY HILL   •   NEW YORK

**STARK&STARK**
A PROFESSIONAL CORPORATION

Honorable Curtis E. von Kann
September 16, 2005
Page 2

proximity to the scheduled commencement, a request was made on Lurgi's behalf for an adjournment of the hearing for a reasonable time, to allow for the substitution of trial counsel to assume Mr. Hilliard's responsibilities in this matter.

However, these circumstances were complicated by the fact that the claimant, Frank W. Hake, Inc. ("Hake"), has taken the position that Hake and its parent company, Matrix, will suffer economic prejudice if the arbitration does not proceed promptly and result in an award by October 31, 2005. (While representations were made by counsel regarding the Hake/Matrix financial problems, there was no evidence presented to Your Honor that detailed the claimed financial difficulties or the prejudice allegedly to be incurred.) As was addressed during the telephone conference leading up to ORDER NO. 6, Your Honor's schedule is such that there are reportedly only limited dates available for the hearing of this matter. As was indicated in paragraph 6 of ORDER NO. 6, if this matter is not concluded by October 31, 2005, based upon Your Honor's schedule, the matter would have to be adjourned until January 2006.

In making the ruling which established the start date for the hearing, Your Honor indicated that, despite the medical problems suffered by Mr. Hilliard, between the law firms of Stark & Stark, P.C. and Wormser, Kiely, Galef & Jacobs LLP[1], there appear to be a sufficient number of attorneys that could assume the responsibilities of Mr. Hilliard and get up to speed in the two and one-half weeks that remained before the hearing commencement date of September 19, 2005. We respectfully disagree.

While I have assumed Mr. Hilliard's role as lead counsel and will commence this matter on September 19th, an obvious prejudice has resulted to Lurgi from the limited time I have had available to familiarize myself with all aspects of this case. This matter is extremely complex, involving complicated engineering, construction and related theories, and literally hundreds of

---

[1] Additionally, in ORDER NO. 6, Your Honor suggested that Glenn M. Azzinari, Esq. of the Wormser Kiely firm would be able to participate and possibly assume some of the responsibilities of Mr. Hilliard. Although Mr. Azzinari had previously participated in the Mediation of this matter (which involved no discovery and only an exchange of position papers), he has had only limited involvement in the arbitration since its inception.

**STARK&STARK**
A PROFESSIONAL CORPORATION

Honorable Curtis E. von Kann
September 16, 2005
Page 3

thousands of documents.[2] Hake's lead counsel, who has been involved in the case from the beginning, will have an extraordinary advantage in understanding those complexities, to my client's detriment.

Nevertheless, pursuant to the terms of Your Honor's Order, we have made every effort to take on the daunting task of preparing to proceed on the designated date. However, we wish to make clear for purposes of the record that while Lurgi will proceed on that date in accordance with <u>ORDER NO. 6</u> and despite its stated objection, we are doing so under protest. We believe our client has suffered substantial prejudice due to the limited time within which we have had the ability to prepare this matter. Therefore, pursuant to the JAMS Rules and the Federal Rules of Arbitration, we wish the record to reflect that, while Lurgi will comply with the Court's <u>ORDER NO. 6</u> and proceed on September 19, 2005, it is doing so under protest due to the inadequate time allowed to prepare this matter for the scheduled hearing.

There is also a second matter which Lurgi presents and requests to be made a part of the record, relating to issues surrounding the deposition of the plaintiff's expert, Walter Wachter. To wit, at the time of Mr. Wachter's deposition at the end of August, and contrary to the provisions of previous Orders entered in this matter, Mr. Wachter served a supplemental expert report. This turn of events was the subject of a telephone conference between Your Honor, Mr. Hilliard and Jonathan M. Preziosi, Esquire, on or about August 28, 2005. Lurgi set forth its position that Mr. Wachter's report obviously represents a "new expert theory on the case," and espouses substantially different theories than those set forth in his original report. However, Your Honor deemed the new materials and opinions not to constitute a supplementary expert report. Lurgi disagrees with the ruling made on that date, believes that the report is contrary to the Orders entered in this matter and further unduly prejudices Lurgi.

Based on the above, I am requesting on behalf of Lurgi that the record of these proceedings reflect Lurgi's protest as to these matters, as well as Lurgi's reservation of its rights with regard to the prejudice to Lurgi resulting from the rulings made on these matters.

---

[2] By way of illustration, Mr. Hilliard had prepared approximately 600 exhibits for potential use at the hearings.

**STARK&STARK**
A PROFESSIONAL CORPORATION

Honorable Curtis E. von Kann
September 16, 2005
Page 4

The foregoing is limited to the circumstances existing as of the start of this week. As we discussed with you today, Lurgi's expert witness, Willis Hembree of HDH Consultants, suffered a cardiac incident yesterday. We still do not know the specific details of that event or of its impact on this matter. We look forward to the opportunity of discussing this new issue with you when the relevant facts are determined.

Respectfully submitted,

STARK & STARK
A Professional Corporation

By: _____
KEVIN M. HART

KMH/cac

c.:   Glenn M. Azzinari, Esquire
      Jonathan M. Preziosi, Esquire
      Scot T. Ojard

# EXHIBIT B

# EXHIBIT B

```
                                                           1
 1                    JAMS
 2              Arbitration Proceeding
 3   - - - - - - - - - - - - -
 4   FRANK W. HAKE, INC.,      )
 5            and             ) Reference No.
 6   LURGI LENTJES NORTH       )  145000024
 7   AMERICA, INC.             )
 8   - - - - - - - - - - - - -
 9
10              ARBITRATION VOLUME 1
11
12                       Washington, D.C.
13                       Monday, September 19, 2005
14
15       The arbitration convened on Monday,
16   September 19, 2005, commencing at 9:31 a.m., at the
17   offices of JAMS, 555 13th Street, N.W, Suite 400
18   West, Washington, D.C. 20004, before Karen K.
19   Brynteson, Registered Merit Reporter, Certified
20   Realtime Reporter, and Notary Public.
21
22   BEFORE:
23        HON. CURTIS EMERY von KANN
24        Mediator/Arbitrator - JAMS
25
```

66

1 piece. We set number 3 as one piece, number 2 as
2 one piece, and number 1 as one piece. And then we
3 put the inlet hood on as one piece.
4    Q.  Okay. And how did you stage the lifts for
5 the right-hand side of this assembly, the duct work?
6    A.  We took these modulars and we double
7 stacked them, meaning that we took 5B-1 on the
8 ground and we put 5B-2 on top of it and welded that
9 joint right there. Then we lifted that as an
10 assembly, two duct sections as one.
11        And we did the same technique on 5C-1 and
12 5C-2, stacked them together, created -- welded all
13 that out and sent it as an assembly up in the air.
14        And then what we also did was there was an
15 AIG grid, ammonia injection grid in this upper 2C-2.
16 We preassembled all that piping inside. And so when
17 this whole thing flies, it flies essentially with
18 all its internal components. We did the same thing
19 with these lower two, 5B-1 and 5B-2.
20       ARBITER von KANN:  Was it part of Hake's
21 contract to install the internal components?
22       THE WITNESS:  There was an AIG grid that
23 had to be provided and put in by us, okay? There
24 was a duct burner that got slided and supported.
25 But outside of those two elements, these things were

67

1 supposed to come complete and ready to go.
2       ARBITER von KANN:  I tell you what, I
3 think this is probably a good time to take a
4 ten-minute break.
5       MR. PREZIOSI:  Yes, Your Honor.
6       ARBITER von KANN:  So if everybody looks
7 at your watch, because everybody's watches are
8 different and add ten minutes and be back then.
9       (A recess was taken at 10:50 a.m.)
10      ARBITER von KANN:  Mr. Preziosi, you're
11 on.
12      MR. PREZIOSI:  Your Honor, let the record
13 reflect, if you would, during a break we did need to
14 make a modification to the poster board to your
15 left, which is Hake Exhibit 2. There is a question
16 about the 5A duct which had previously incorrectly
17 designated that was a Mod duct.
18      ARBITER von KANN:  Okay.
19      MR. PREZIOSI:  5A is not a Mod duct, so we
20 removed the reference to Mod.
21      MR. HART:  Your Honor, before we begin,
22 and I don't mean to interrupt, on the question of
23 the sequestration, Mr. Wachter, who is the expert,
24 is sitting through and I guess when I made that
25 originally, I really intended to relate that to the

68

1 fact witnesses as opposed to the experts.
2       So I guess I would say my sense with trial
3 team type thing, the expert thing is different, so I
4 guess I am raising the question of whether it is
5 appropriate for the experts to be present through
6 the entire factual testimony. And I apologize I did
7 not raise it at the outset, but frankly, what we
8 have done up to this point I don't think is of
9 anything that would be a concern to me.
10      ARBITER von KANN:  Well, usually experts
11 are an exception to the rule of sequestration,
12 experts on both sides. The theory being, of course,
13 they are supposed to absorb all the pertinent facts
14 and if they hear some stuff in the testimony that
15 causes them to adjust their opinion, so I think
16 normally we would allow it.
17      And I realize your expert is not available
18 to sit in, but hopefully will be soon. And as far
19 as I'm concerned, he can sit in for as much of the
20 testimony as he is able to or review the transcripts
21 of the testimony.
22      So I think with respect to experts, it is
23 permissible form. All right. Let's go ahead.
24      BY MR. PREZIOSI:
25      Q.  Mr. Kazokas, I don't have any further

69

1 questions regarding Hake 2 at this point.
2    A.  Okay.
3    Q.  Your Honor, we have one last visual
4 demonstrative exhibit before we get into the nuts
5 and bolts, but we had wanted the opportunity of a
6 site visit before the arbitration commenced. That
7 turned out not to be possible.
8       We do have a redacted site video. It is a
9 video that was supplied in full to Lurgi during the
10 course of discovery. We edited it down to 15
11 minutes, so you can get the site inspection that we
12 were physically unable to get before.
13      ARBITER von KANN:  Is there narration?
14      THE WITNESS:  I will walk you through it.
15      ARBITER von KANN:  You are going to do it.
16      MR. PREZIOSI:  I am not going to say
17 anything.
18      ARBITER von KANN:  So I guess your
19 question is tell us about the site video, is that
20 it? Okay.
21      THE WITNESS:  We're approaching the unit
22 from the unit 1 side. There is existing stack unit
23 1, existing precipitator. Right in here is the SCR
24 structure.
25      You are walking down one of the main

18 (Pages 66 to 69)