IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**ALLIED ENVIRONMENTAL SOLUTIONS, INC.,**
**formerly known as,**
**Lurgi Lentjes North America, Inc.**
**9730 Patuxent Woods Drive, Suite 100**
**Columbia, Maryland 21046-1626,**

        **Petitioner,**

        **v.**

**FRANK W. HAKE, INC.,**
**1500 Chester Pike**
**Eddystone, Pennsylvania 19022,**

        **Respondent.**

**Civil Action No.**

## DECLARATION OF MARTIN P. SCHRAMA

I, Martin P. Schrama, declare as follows:

1.     I am an attorney-at-law of the State of New Jersey and associated with the law firm of Stark & Stark, P.C., attorneys for the Petitioner, Allied Environmental Solutions, Inc. (formerly known as Lurgi Lentjes North America, Inc. ("Lurgi")), and, as such, have knowledge of the facts set forth herein.

2.     I am a 1997 graduate of Villanova University School of Law.  I have practiced with the law firm of Stark and Stark since 2001.  During most of that time I have worked under the direct supervision of Craig Hilliard, a shareholder of Stark and Stark and a member of the firm's litigation department.

### Hake's Original Claim Was For Less Than $600,000

3.     Frank W. Hake, Inc. ("Hake") filed its first of numerous construction lien claims against the project property on March 2, 2004.  The original lien claim filed by Hake was in the

amount of $597,213.55, as detailed in the claim form attached to this declaration as Exhibit A. Over the next several months, Hake continued to amend and expand its lien claims against Lurgi.

4.      Thereafter, on or about May 21, 2004, Hake filed a petition for emergency relief, including a Temporary Restraining Order and immediate foreclosure on its construction liens, with the New Jersey State Courts.  These suits were promptly quashed, as the parties had agreed to mediate and arbitrate all disputes.

5.      On September 14, 2004, Hake filed a Mediation and Arbitration Demand claiming economic damages exceeding $7.5 million—six months after it had initially filed a lien claim for less than $600,000.00.  Hake claimed that Lurgi owed Hake $4.4 million for unpaid invoices and also an additional $3 million in charges that Hake had never invoiced, and that Lurgi had never approved.

### Hake Was Substantially Paid On The $28 Million Subcontract

6.      The subcontract between Lurgi and Hake was for a base amount of $28,450,655. The contract provided for Lurgi to retain 5% of the amount due Hake and permitted Lurgi to withhold approved payments to Hake where it is in the "reasonable judgment" of Lurgi.

7.      Nevertheless, as of the time of the arbitration, Lurgi had paid Hake a total of $28,317,925, which equals over 99.5% of the original contract amount.

### Mr. Hilliard Was Lurgi's Lead Counsel And My Supervising Attorney

8.      In or around that time, due to the complex nature of the case, including the breadth of information involved, intricate technology at issue and size of the claims, it was decided that Craig S. Hilliard, would act as lead trial counsel for the case.

9.      Mr. Hilliard is an equity shareholder in Stark and Stark, P.C.'s commercial litigation section and head of the intellectual property practice group.  I am Mr. Hilliard's associate, and I worked directly under his supervision and direction.

10.     I acted as second chair for Lurgi in the arbitration.  Glenn Azzinari, of the Wormser, Kiely, Galef & Jacobs LLP firm, monitored the litigation as outside counsel, but he did not take an active role in trial preparation.  Indeed, Mr. Azzinari did not attend even one deposition taken in the matter, nor did he participate in document production or review.

11.     At no time before Mr. Hilliard's departure on August 31, 2005, was it ever discussed or contemplated that anyone but Mr. Hilliard would be lead trial counsel.

### Proceedings Leading Up To The Arbitration

12.     As noted above, Hake originally attempted to bring its claim (in the original amount of about $600,000) in the New Jersey courts.  Lurgi petitioned the New Jersey Superior Court to stay Hake's lawsuit and compel mediation/arbitration pursuant to the Subcontract (over Hake's objection), and this petition was granted on or about August 6, 2004.

13.     Over a month later — on September 19, 2004 — Hake finally submitted its demand for mediation/arbitration.  Thereafter, the parties proceeded to non-binding mediation in accordance with the subcontract.

14.     The unsuccessful mediation was concluded on or about January 18, 2005, at the JAMS offices in Washington, D.C.

15.     Judge Curtis E. von Kann was appointed to preside over the arbitration on March 21, 2005.

### The Documentary Record For The Arbitration Was Enormous

16.     After the mediation failed, we began the task of marshalling, exchanging and reviewing the extensive amount of project documents involved in the $85 million retrofit of the power plant.  Hake was Lurgi's mechanical and erection subcontractor, and it was the largest subcontractor on the project.  Thus Hake's name and involvement permeated the vast majority of project issues and documents.

17.     Lurgi reviewed and tagged Hake's documents for copying throughout the month of May, but did not receive copies of the documents selected until late June 2005. Even then, Lurgi still experienced significant document issues that impacted the ability of Lurgi's expert to complete his work.

18.     It soon became readily apparent that the volume of documents exchanged between the parties would be daunting. I estimate that, between each side's hard and electronic documents, there were upwards of 500 boxes of documents to be reviewed. In fact, the parties' copying costs alone for the documents exceeded $100,000.

19.     Accordingly, and because of the volume of documents and their technical complexity, it was agreed on the Lurgi side that Lurgi's document review duties would have to be primarily borne by Lurgi's expert, Willis Hembree. Thus, as counsel for Lurgi, we relied on Mr. Hembree's personal knowledge of the documents, facts, and issues based on his own credentials as an expert and his review of the documentary record assembled in the case.

### Lurgi's Expert, Willis Hembree, Became The Master Of The Documents And Issues For Lurgi

20.     Mr. Hembree spent much time and became the most familiar with the documents that affected every facet of the litigation. Mr. Hilliard and I relied upon Mr. Hembree to locate, produce and designate key documents to be introduced at the depositions of Hake personnel and at the arbitration hearing, and to advise us as to the significance of those documents and the documents that Hake was likely to introduce.

21.     While I was involved primarily in litigation support and drafting arbitration submissions, Mr. Hilliard took the lead role in dealing directly with Mr. Hembree and proposed witnesses and preparing them for the arbitration hearing. Mr. Hilliard also took the lead role in addressing Hake's expert testimony, in deposing Hake's expert and in preparing to cross-examine

4

Hake's expert at the arbitration.

### Mr. Hilliard Withdrew From The Case

22.     Upon Mr. Hilliard's withdrawal from the practice of law and the case on August

31, 2005, it was obvious that I was not in a position, based on my relative experience and

involvement, to act as lead trial counsel in a case that encompassed over $30 million in

combined claims.  It was also clear that Mr. Azzinari, who had not attended a single deposition

and was not involved in any hearing preparation activities, was not serving as litigation co-

counsel in this case.  Moreover, even if he had been a litigation attorney for this case, Mr.

Azzinari did not have sufficient familiarity with the case to act a lead counsel.  Therefore, it was

decided that Lurgi would have to seek a postponement in this matter.  And, it was decided that

Kevin Hart, a senior litigator in Stark and Stark, P.C.'s commercial litigation section, would have

to step in for Mr. Hilliard.  I had never worked with Mr. Hart before this time.

### The Arbitrator Denied Lurgi's Request For A Postponement Based On Unsubstantiated Claims Of Financial Ruin By Hake And Its Parent

23.     I participated in the calls with the arbitrator on August 31, 2005, and September 1,

2005.  My firm's managing partner, Mr. Pepperman, participated in the September 1, 2005 call.

During both calls, Lurgi asked for a postponement of the hearing because of Mr. Hilliard's

sudden unavailability.

24.     During the August 31, 2005, call, counsel for Hake, Mr. Preziosi, stated that he

could not agree to the postponement beyond September 12, 2005, because Hake needed an award

by October 31, 2005.  As stated by the Arbitrator in his Order No. 6, counsel for Hake

"represented that receiving the award by that date had become a critical factor in a complex

refinancing plan which [Hake] had worked out with its lenders.  Any delay which pushed the

award past October 31 jeopardized the refinancing plan and thus the survivability of [Hake]."

Order No. 6 at 5. Counsel for Hake neither offered, nor submitted, any substantiation for this representation, nor was any substantiation requested by the Arbitrator.

25. During the September 1, 2005, call, Hake would not agree to Lurgi's need and request for a postponement. Instead, it only agreed to start the arbitration on September 19, 2005. Also participating in the September 1, 2005 call was John J. Carwile of a Tulsa, Oklahoma law firm that represented Matrix Service Company, a publicly-owned company that is Hake's parent company. As the Arbitrator confirmed, Mr. Carwile represented during that call that "Matrix was a publicly owned company whose survival was very much in doubt and that getting an arbitration award in this matter was critical to its efforts to restructure its financing and save the company." Again, no substantiation for this statement was offered or submitted by or on behalf of Hake, nor was it requested by the Arbitrator.

26. The Arbitrator relied on these representations in refusing to postpone the hearing beyond the September 19th date picked by Hake: "Hake, and its parent Matrix, have repeatedly represented that they will suffer severe prejudice, perhaps liquidation, if the arbitration does not proceed promptly and result in an award by October 31, 2005." Order No. 6 at 7.

27. According to a press release from Matrix of December 21, 2005, it completed refinancing of its senior credit facility well before the award was issued in this matter. The press release is attached to this declaration as Exhibit B.

28. Moreover, Matrix was actually making a profit from at least June 2005. In a Form 10-Q filed on October 6, 2005 for the quarter ended August 31, 2005, Matrix reported that its revenues grew by almost 30% to $108,996,000 as compared to the same period a year earlier. Matrix went from reporting a loss for that period a year earlier to reporting a profit. Copies of the pertinent pages from the Matrix Form 10-Q for the period ending August 31, 2005, are

attached as Exhibit C.

29.    In that same 10-Q, Matrix reported that its EBITDA — earnings before taxes, interest expense, depreciation and amortization —- had improved by 320% over the same period from the year before.  It increased to $4,831,000 from $1,130,000.  *Id.* at 30.  As explained by Matrix, EBITDA "is used by the financial community as a method of measuring our performance…."  *Id.* at 29.

30.    In a letter to Matrix shareholders in early October 2005, Matrix President Michael J. Hall reported that Matrix was "in a position to return to profitable growth."  Matrix Annual Report at 2, attached as Exhibit D.  Mr. Hall predicted revenues of "between $375 million to $425 million," that "we are confident that our restructuring efforts will succeed and anticipate fiscal year 2006 will be profitable" and that we "expert fiscal 2006 to be a successful year for Matrix Service…."  *Id.*

31.    Matrix completed a $15 million private placement of stock on October 3, 2005 and that the money was used to reduce its debt and "to provide additional liquidity for working capital needs."  Matrix Form 10-Q (11/30/05) at 16, attached to this declaration as Exhibit E.

32.    Contrary to the uncorroborated, but repeated, claims of financial doom,a January 5, 2006 press release from Matrix  states that Matrix produced net income for the quarter ended November 30, 2005 of over $2 million.  Its revenues for the six-month period ending November 30, 2005 increased to $235.8 million from $198.5 million for the comparable period a year before.  According to its Mr. Hall, "we continue to believe Matrix Service will be essentially free of all bank debt by May 31, 2006…."  A copy of the January 5, 2006 Matrix press release is attached as Exhibit F.

33.    Matrix's alleged dire financial condition was the sole prejudice raised by Hake

in opposing the postponement requested by Lurgi as a result of the unavailability of Messrs. Hilliard and Hembree and was the sole prejudice to Hake identified by the Arbitrator in denying Lurgi's request for a postponement. I attended all conferences with the Arbitrator. None of the above-mentioned facts detailing Matrix's/Hake's actual financial status were disclosed to the Arbitrator.

### Lurgi Was Prejudiced In The Presentation Of Its Case Because Of The Arbitrator's Refusal To Grant A Postponement

34.     On or about September 1, 2005, I began to introduce to Mr. Hart some of the more significant themes and evidence involved in the case in the short time span allotted. Of course, this was a daunting task due to the volume of documents involved in this case, the complexity of the issues, the size and scope of the claims and defenses, and the reliance by Mr. Hilliard up to that point on Mr. Hembree's unique knowledge of the documents, facts, and issues. During this time, Mr. Hilliard was completely unavailable to aid in trial preparation, and Mr. Hembree had limited availability to us.

35.     Throughout the course of the hearings, Mr. Hart and I were forced to use valuable time to continue to try to familiarize ourselves with the documents, witnesses and expert testimony, all of which Mr. Hart was seeing for the first time. In contrast, counsel for Hake had been working on this matter since March 2004, and was very familiar with the facts, the documents, the issues, and the witnesses, and Hake had its expert working on this matter from March 2004 and sitting at counsel table from the outset of the hearings.

36.     Mr. Hart also had to meet for the first time and to prepare many of the witnesses for the arbitration hearing a night or two before they were to testify. In contrast, counsel for Hake had been working with its witnesses for months or, in some cases, over a year.

37.     When we lost the services of Mr. Hembree, we were particularly disadvantaged in

preparing for the factual phase of the hearings, as neither Mr. Hart nor I had the familiarity of Mr. Hembree with the documents, facts, and issues. Indeed, without Mr. Hembree, we had no expert consultant at all to advise us as Hake presented its case and its witnesses. This adversely impacted our ability to prepare for the cross-examination of witnesses, including the selection of documents to use in cross-examination, the identification of issues to raise in cross-examination, and the full understanding of the significance of the testimony presented by the witnesses in the context of this case. Moreover, Mr. Hembree's situation adversely affected our presentation of our own witnesses as he was not available to consult with us on issues and facts to stress and documents to present and highlight.

38.    It was known to Hake and its witnesses that we did not have a consulting expert in the arbitration hearing with us, contrary to Hake, which had its expert sitting with counsel every day listening to the testimony of the witnesses. To the extent that having a knowledgeable expert present to listen to the testimony of witnesses and experts and to serve as a "brake" on puffing and exaggeration, Hake had that and Lurgi did not. Moreover, Hake had an expert who could guide its counsel to relevant portions of the documents and deposition testimony to use in the presentation of its case and in the cross-examination of witnesses. Lurgi did not have that, either.

Pursuant to 28 U.S.C. § 1746, I declare under the penalties of perjury that the foregoing declaration is true and correct.


Executed on: _____03/16/06_____            _____

                                                    Martin P. Schrama

# EXHIBIT A

## CONSTRUCTION LIEN CLAIM

TO:  THE CLERK, COUNTY OF MERCER

   In accordance with the terms and provisions of the "Construction Lien Law," P.L.1993, c. 318 (<u>N.J.S.A.</u> 2A:44A-1 et seq.), notice is hereby given that:

   1.  Frank W. Hake, Inc. of 1500 Chester Pike, Eddystone, PA 19022-1396 (the "Claimant") has on March 2, 2004 claimed a construction lien against the below stated real property of PSEG Fossil, L.L.C., in the amount Five Hundred Ninety Seven Thousand Two Hundred Fourteen and 55/100 dollars ($597,213.55), for the value of the work, services, material or equipment provided in accordance with a contract with Lurgi Lentjes North America, Inc. for the following work, services, materials or equipment:

     a. Layout, excavate and install foundations (steel pipe piles, reinforcement rebar, concrete, and backfill/asphalt) for two (2) Selective Catalytic Reduction (SCR) units and one (1) ammonia unloading/storage facility.  Erection of a Selective Catalytic Reduction (SCR) process including structural steel, rotating gas-to-gas heater, low leak fan system, sootblowers, sonic horns, ductwork, ductburners, ammonia injection grid, and SCR casing with two (2) catalyst levels.  Erection of a three (3) level structural steel mezzanine between the SCR structures and set miscellaneous mechanical equipment/tanks and pre-engineered building on mezzanine levels and at ammonia area.

   2.  The amount due for work, services, materials or equipment delivery provided by Claimant in connection with the improvement of the real property, and upon which this lien claim is based, is as follows:

| | | |
|---|---|---|
| TOTAL AMOUNT OF CONTRACT BILLED TO DATE | $ | 27,345,073 |
| AMENDMENTS TO CONTRACT THAT WERE BILLED TO DATE | $ | 2,937,320 |
| TOTAL ADJUSTED CONTRACT VALUE | $ | 30,282,393 |
|  Less:  Agreed upon Credits: | $ | 1,367,254 |
| CONTRACT AMOUNT PAID TO DATE | $ | 25,977,819 |
| AMENDMENTS TO CONTRACT AMOUNT PAID TO DATE | $ | 2,340,107 |

PR: #540261 v2 (hkv9021.DOC)

| | | |
|---|---|---|
| TOTAL REDUCTIONS FROM CONTRACT AMOUNT AND AMENDMENTS TO CONTRACT: | $ | 1,367,254 |
| **TOTAL LIEN CLAIM** | $ | 597,214 |

3.    This construction lien is claimed against the interest of PSEG Fossil, L.L.C. as:

___X___    Owner

_____    Lessee

_____    Other

in that certain tract or parcel of land and premises described as Block 2506, Lot 8, on the tax map of the Township of Hamilton, County of Mercer, State of New Jersey and otherwise known as 2512 Lamberton Road, Hamilton, New Jersey, for the improvement of which property the aforementioned work, services, materials or equipment was provided.

4.    The work, services, materials or equipment was provided pursuant to the terms of a written contract dated May 14, 2003, between Frank W. Hake, Inc. and Lurgi Lentjes North America, Inc. located at 6724 Alexander Bell Drive, Columbia, Maryland 21046.

5.    The date of the provision of the last work, services, material or equipment for which payment is claimed is February 5, 2004.

### NOTICE TO OWNER OF REAL PROPERTY

Your real estate may be subject to sale to satisfy the amount asserted by this claim.  However, your real estate cannot be sold until the facts and issues which form the basis of this claim are decided in a legal proceeding before a court of law. The lien claimant is required by law to commence suit to enforce this claim.

The claimant filing this lien claim shall forfeit all rights to enforce the lien and shall be required to discharge the lien of record, if the claimant fails to bring an action in the Superior Court, in the county in which the real property is situated, to establish the lien claim:

1.    Within one year of the date of the last provision of work, services, material or equipment, payment for which the lien claim was filed; or

-2-

2.  Within 30 days following receipt of written notice, by personal service or certified mail, return receipt requested, from the owner requiring the claimant to commence an action to establish the lien claim.

You will be given proper notice of the proceeding and an opportunity to challenge this claim and set forth your position.  If, after you (and/or your contractor or subcontractor) have had the opportunity to challenge this lien claim, the court of law enters a judgment against you and in favor of the claimant filing this lien claim, and thereafter you fail to pay that judgment, your real estate may then be sold to satisfy the judgment.

You may choose to avoid subjecting your real estate to sale by doing either of the following:

1.  You (or your contractor or subcontractor) can pay the claimant and obtain a discharge of lien claim from the claimant;  or

2.  You (or your contractor or subcontractor) can cause the lien claim to be discharged by filing a surety bond or making a deposit of funds as provided for in section 31 of P.L.1993, c. 318 (N.J.S.A. 2A:44A-31).

If you (or your contractor or subcontractor) choose to pay the claimant under 1. above, you will lose your right to challenge this lien claim in a legal proceeding before a court of law.

If you (or your contractor or subcontractor) choose to discharge the lien claim by filing a surety bond or making a deposit of funds as provided in section 31 of P.L.1993, c. 318 (N.J.S.A. 2A:44A-31), you will retain your right to challenge this lien claim in a legal proceeding before a court of law.

PR: #540261 v2 (bkv9021.DOC)

**NOTICE TO SUBCONTRACTOR OR CONTRACTOR:**

This lien has been filed with the county clerk and served upon the owner of the real estate. This lien places the owner on notice that the real estate may be sold to satisfy this claim unless the owner pays the claimed sum to this claimant.

Frank W. Hake, Inc.

By: _____

Dated:  March 2, 2004

**CLAIMANT'S REPRESENTATION AND VERIFICATION**

Claimant represents and verifies that:

1.  The amount claimed herein is due and owing at the date of filing, pursuant to claimant's contract described in the construction lien claim.

2.  The work, services, material or equipment for which this lien claim is filed was provided exclusively in connection with the improvement of the real property which is the subject of this claim.

3.  This claim has been filed within 90 days from the last date upon which the work, services, materials or equipment for which payment is claimed was provided.

4.  The foregoing statements made by me are true, to the best of my knowledge. I am aware that if any of the foregoing statements made by me are false, this construction lien claim will be void and that I will be liable for damages to the owner or any other person injured as a consequence of the filing of this lien claim.

Frank W. Hake, Inc.

By: _____

Joseph J. Nestel.

Dated:  March 1, 2004

COMMONWEALTH OF PENNSYLVANIA

Notarial Seal
Carolyn K. Moir, Notary Public
Eddystone Boro, Delaware County
My Commission Expires Feb. 2, 2008

Member, Pennsylvania Association of Notaries

PR: #540261 v2 (bkv9021.DOC)

**END OF DOCUMENT**



## AMENDMENT TO CONSTRUCTION LIEN CLAIM

TO:  THE CLERK, COUNTY OF MERCER:

On March 1, 2004, the undersigned claimant, Frank W. Hake, Inc. of 1500 Chester Pike, Eddystone, PA 19022-1396 (the "Claimant") filed a CONSTRUCTION LIEN CLAIM in the amount of Five Hundred Ninety Seven Thousand Two Hundred Fourteen and 55/100 dollars ($597,213.55) for the value of the work, services, material or equipment provided in accordance with the contract between Claimant and Lurgi Lentjes North America, Inc. dated May 14, 2003.

This construction lien claim was claimed against the interest of PSEG Fossil, L.L.C. as:

____X____ Owner

_____ Lessee

_____ Other

in that certain tract or parcel of land and premises described as **Block 2506, Lot 8, on the tax map of the Township of Hamilton, County of Mercer, State of New Jersey and otherwise known as 2512 Lamberton Road, Hamilton, New Jersey**, for the improvement of which property the aforementioned work, services, materials or equipment was provided.

This amends a lien claim which was previously filed with the County Clerk of Mercer County on March 1, 2004, as **No. 200403020703 in Book No. 32, Page 98.**

Effective the date of the filing of this AMENDMENT TO CONSTRUCTION LIEN CLAIM, the value of the lien is claimed to be in the total amount of **Two Million, Six Hundred Forty Thousand, Six Hundred Twenty-Three and 53/100 Dollars ($2,640,623.53)**, inclusive of all prior lien claims or amendments thereof.

The work, services, material or equipment provided upon which this Amendment is made are as follows:

(a)  Layout, excavate and install foundations (steel pipe piles, reinforcement rebar, concrete, and backfill/asphalt) for two (2) Selective Catalytic Reduction (SCR) units and one (1) ammonia unloading/storage facility.

-1-

PR: #540261 v2 (bkv9021.DOC)

(b)  Erection of a Selective Catalytic Reduction (SCR) process including structural steel, rotating gas-to-gas heater, low leak fan system, sootblowers, sonic horns, ductwork, ductburners, ammonia injection grid, and SCR casing with two (2) catalyst levels.

(c)  Erection of a three (3) level structural steel mezzanine between the SCR structures and set miscellaneous mechanical equipment/tanks and pre-engineered building on mezzanine levels and at ammonia area.

The date of the provision of the last work, services, material or equipment for which payment is claimed is April 30, 2004.

PR: #540261 v2 (blv9021.DOC)

### NOTICE TO OWNER OF REAL PROPERTY

Your real estate may be subject to sale to satisfy the amount asserted by this claim.  However, your real estate cannot be sold until the facts and issues which form the basis of this claim are decided in a legal proceeding before a court of law. The lien claimant is required by law to commence suit to enforce this claim.

The claimant filing this lien claim shall forfeit all rights to enforce the lien and shall be required to discharge the lien of record, if the claimant fails to bring an action in the Superior Court, in the county in which the real property is situated, to establish the lien claim:

1.    Within one year of the date of the last provision of work, services, material or equipment, payment for which the lien claim was filed; or

2.    Within 30 days following receipt of written notice, by personal service or certified mail, return receipt requested, from the owner requiring the claimant to commence an action to establish the lien claim.

You will be given proper notice of the proceeding and an opportunity to challenge this claim and set forth your position.  If, after you (and/or your contractor or subcontractor) have had the opportunity to challenge this lien claim, the court of law enters a judgment against you and in favor of the claimant filing this lien claim, and thereafter you fail to pay that judgment, your real estate may then be sold to satisfy the judgment.

You may choose to avoid subjecting your real estate to sale by doing either of the following:

1.    You (or your contractor or subcontractor) can pay the claimant and obtain a discharge of lien claim from the claimant; or

2.    You (or your contractor or subcontractor) can cause the lien claim to be discharged by filing a surety bond or making a deposit of funds as provided for in section 31 of P.L.1993, c. 318 (N.J.S.A. 2A:44A-31).

If you (or your contractor or subcontractor) choose to pay the claimant under 1. above, you will lose your right to

-3-

PR: #54026.1 v2 (bkv9021.DOC)

challenge this lien claim in a legal proceeding before a court of law.

If you (or your contractor or subcontractor) choose to discharge the lien claim by filing a surety bond or making a deposit of funds as provided in section 31 of P.L.1993, c. 318 (N.J.S.A. 2A:44A-31), you will retain your right to challenge this lien claim in a legal proceeding before a court of law.

**NOTICE TO SUBCONTRACTOR OR CONTRACTOR:**

This lien has been filed with the county clerk and served upon the owner of the real estate. This lien places the owner on notice that the real estate may be sold to satisfy this claim unless the owner pays the claimed sum to this claimant.

Frank W. Hake, Inc.

By: _____
David Kazokas
Vice President

Dated: May 20, 2004

PR: #540261 v2 (bkv9021.DOC)

## CLAIMANT'S REPRESENTATION AND VERIFICATION

Claimant represents and verifies that:

1.    The amount claimed herein is due and owing at the date of filing, pursuant to claimant's contract described in the construction lien claim.

2.    The work, services, material or equipment for which this lien claim is filed was provided exclusively in connection with the improvement of the real property which is the subject of this claim.

3.    This claim has been filed within 90 days from the last date upon which the work, services, materials or equipment for which payment is claimed was provided.

4.    The foregoing statements made by me are true, to the best of my knowledge.  I am aware that if any of the foregoing statements made by me are false, this construction lien claim will be void and that I will be liable for damages to the owner or any other person injured as a consequence of the filing of this lien claim.

Frank W. Hake, Inc.

By: _____
David Kazokas
Vice President


Dated:  May 20, 2004


**END OF DOCUMENT**

PR: #540261 v2 (bkv902!.DOC)

**AMENDMENT TO CONSTRUCTION LIEN CLAIM**

TO:  THE CLERK, COUNTY OF MERCER:

On March 1, 2004, the undersigned claimant, Frank W. Hake, Inc. of 1500 Chester Pike, Eddystone, PA 19022-1396 (the "Claimant") filed a CONSTRUCTION LIEN CLAIM in the amount of Five Hundred Ninety Seven Thousand Two Hundred Fourteen and 55/100 dollars ($597,213.55) for the value of the work, services, material or equipment provided in accordance with the contract between Claimant and Lurgi Lentjes North America, Inc. dated May 14, 2003.

This construction lien claim was claimed against the interest of PSEG Fossil, L.L.C. as:

    ___X___  Owner

    _____  Lessee

    _____  Other

in that certain tract or parcel of land and premises described as **Block 2506, Lot 8, on the tax map of the Township of Hamilton, County of Mercer, State of New Jersey and otherwise known as 2512 Lamberton Road, Hamilton, New Jersey,** for the improvement of which property the aforementioned work, services, materials or equipment was provided.

This amends a lien claim which was previously filed with the County Clerk of Mercer County on March 1, 2004, as **No. 200403020703 in Book No. 32, Page 98.**

Amendments to the original claim were recorded in the office of the County Clerk on May 21, 2004 as **No.2004018241 in Book No. 33, Page 26.**

Effective the date of the filing of this AMENDMENT TO CONSTRUCTION LIEN CLAIM, the value of the lien is claimed to be in the total amount of **Three Million, Eight Hundred Thirty-One Thousand, Five Hundred Fifty-Seven and 47/100 Dollars ($3,831,557.47)**, inclusive of all prior lien claims or amendments thereof.

The work, services, material or equipment provided upon which this Amendment is made are as follows:

-1-

PR: #540261 v2 (bkv9021.DOC)

(a)  Layout, excavate and install foundations (steel pipe piles, reinforcement rebar, concrete, and backfill/asphalt) for two (2) Selective Catalytic Reduction (SCR) units and one (1) ammonia unloading/storage facility.

(b)  Erection of a Selective Catalytic Reduction (SCR) process including structural steel, rotating gas-to-gas heater, low leak fan system, sootblowers, sonic horns, ductwork, ductburners, ammonia injection grid, and SCR casing with two (2) catalyst levels.

(c)  Erection of a three (3) level structural steel mezzanine between the SCR structures and set miscellaneous mechanical equipment/tanks and pre-engineered building on mezzanine levels and at ammonia area.

The date of the provision of the last work, services, material or equipment for which payment is claimed is May 31, 2004.

## NOTICE TO OWNER OF REAL PROPERTY

Your real estate may be subject to sale to satisfy the amount asserted by this claim.  However, your real estate cannot be sold until the facts and issues which form the basis of this claim are decided in a legal proceeding before a court of law. The lien claimant is required by law to commence suit to enforce this claim.

The claimant filing this lien claim shall forfeit all rights to enforce the lien and shall be required to discharge the lien of record, if the claimant fails to bring an action in the Superior Court, in the county in which the real property is situated, to establish the lien claim:

1.    Within one year of the date of the last provision of work, services, material or equipment, payment for which the lien claim was filed; or

2.    Within 30 days following receipt of written notice, by personal service or certified mail, return receipt requested, from the owner requiring the claimant to commence an action to establish the lien claim.

You will be given proper notice of the proceeding and an opportunity to challenge this claim and set forth your position.  If, after you (and/or your contractor or subcontractor) have had the opportunity to challenge this lien claim, the court of law enters a judgment against you and in favor of the claimant filing this lien claim, and thereafter you fail to pay that judgment, your real estate may then be sold to satisfy the judgment.

You may choose to avoid subjecting your real estate to sale by doing either of the following:

1.    You (or your contractor or subcontractor) can pay the claimant and obtain a discharge of lien claim from the claimant; or

2.    You (or your contractor or subcontractor) can cause the lien claim to be discharged by filing a surety bond or making a deposit of funds as provided for in section 31 of P.L.1993, c. 318 (N.J.S.A. 2A:44A-31).

If you (or your contractor or subcontractor) choose to pay the claimant under 1. above, you will lose your right to

challenge this lien claim in a legal proceeding before a court of law.

       If you (or your contractor or subcontractor) choose to discharge the lien claim by filing a surety bond or making a deposit of funds as provided in section 31 of P.L.1993, c. 318 (N.J.S.A. 2A:44A-31), you will retain your right to challenge this lien claim in a legal proceeding before a court of law.

**NOTICE TO SUBCONTRACTOR OR CONTRACTOR:**

       This lien has been filed with the county clerk and served upon the owner of the real estate. This lien places the owner on notice that the real estate may be sold to satisfy this claim unless the owner pays the claimed sum to this claimant.

Frank W. Hake, Inc.

By: _____

David Kazokas
Vice President

Dated: June 4, 2004

-4-

## CLAIMANT'S REPRESENTATION AND VERIFICATION

Claimant represents and verifies that:

1.    The amount claimed herein is due and owing at the date of filing, pursuant to claimant's contract described in the construction lien claim.

2.    The work, services, material or equipment for which this lien claim is filed was provided exclusively in connection with the improvement of the real property which is the subject of this claim.

3.    This claim has been filed within 90 days from the last date upon which the work, services, materials or equipment for which payment is claimed was provided.

4.    The foregoing statements made by me are true, to the best of my knowledge.  I am aware that if any of the foregoing statements made by me are false, this construction lien claim will be void and that I will be liable for damages to the owner or any other person injured as a consequence of the filing of this lien claim.

Frank W. Hake, Inc

By: _____

David Kazokas
Vice President

Dated:  June 4, 2004

END OF DOCUMENT

**EXHIBIT B**



## MATRIX SERVICE
### INDUSTRIAL SERVICE CONTRACTOR

**FOR IMMEDIATE RELEASE**

## MATRIX SERVICE ANNOUNCES COMPLETION OF REFINANCING OF ITS SENIOR CREDIT FACILITY

**TULSA, OK – December 21, 2005 -- Matrix Service Co. (Nasdaq: MTRX),** a leading industrial services company, today announced that the Company has completed the refinancing of its Senior Credit Facility. The new facility consists of a three-year $40 million revolving loan commitment and a five-year $15 million term loan facility. The interest rates on the new facility initially range from LIBOR+3.5% or PRIME+2.0% on the revolver up to LIBOR+5.0% or PRIME+3.5% on the term, versus the 13.3% effective rate on the previous facility, and will vary in the future based in part upon the Company's current total leverage. Prepayments of the term facility are required without penalty interest with 50% of any proceeds from the collection of the previously disclosed disputed contracts.

Michael Hall, president and chief executive officer of Matrix Service Company, said, "I am pleased that the final piece of the Company's capital restructure has been successfully completed. By closing this senior facility transaction, we have effectively lowered our interest rates and eliminated any future fees associated with continuing under the previous senior facility."

Matrix was also successful in receiving an extension of the waiver of the additional 5% interest on the remaining subordinated debt holders $25 million of convertible notes related to the Company's failure to refinance the credit facility prior to September 30, 2005.

### About Matrix Service Company
Matrix Service Company provides general industrial construction and repair and maintenance services principally to the petroleum, petrochemical, power, bulk storage terminal, pipeline and industrial gas industries.

The Company is headquartered in Tulsa, Oklahoma, with regional operating facilities located in Oklahoma, Texas, California, Michigan, Pennsylvania, Illinois, Washington, and Delaware in the U.S. and Canada.

This release contains forward-looking statements that are made in reliance upon the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These statements are generally accompanied by words such as "anticipate", "continues", "expect", "forecast", "outlook", "believe", "estimate", "should" and "will" and words of similar effect that convey future meaning, concerning the Company's operations, economic performance and management's best judgment as to what may occur in the future. Future events involve risks and uncertainties that may cause actual results to differ materially from those we currently anticipate. The actual results for the current and future periods and other corporate developments will depend upon a number of economic, competitive and other influences, including those identified in the "Risk Factors" and "Forward Looking Statements" sections and elsewhere in the Company's reports and filings made from time to time with the Securities and Exchange Commission. Many of these risks and uncertainties are beyond the control of the Company, and any one of which, or a combination of which, could materially and adversely affect the results of the Company's operations and its financial condition. We undertake no obligation to update information contained in this release.

| **For More Information:** | **Investors:** |
|---|---|
| Les Austin | Truc Nguyen |
| Vice President Finance and CFO | The Global Consulting Group |
| 918-838-8822 | 646-284-9418 |
| laustin@matrixservice.com | tnguyen@hfgcg.com |

# # #

# EXHIBIT C

| MATRIX SERVICE COMPA | RR Donnelley ProFile | DALFBU-2K-PF007 9.0.21 | CHI lacyl0da | 07-Oct-2005 12:36 EST | 56137 FS 1 | 2* |
| FORM 10-Q (8/31/05) | | | DAL | | HTM ESS | 0C |
| | | | | | | Page 1 of 1 |

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

## FORM 10-Q

**(Mark One)**

☒  **Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

   **For the quarterly period ended August 31, 2005**

or

☐  **Transition Report Pursuant to Section 13 or 15 (d) of the Securities Exchange Act of 1934**

   For the transition period from _____ to _____

   **Commission File number 001-15461**

# MATRIX SERVICE COMPANY
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE** | **73-1352174** |
| (State of incorporation) | (I.R.S. Employer Identification No.) |

**10701 E. Ute St., Tulsa, Oklahoma 74116-1517**
(Address of principal executive offices and zip code)

**Registrant's telephone number, including area code: (918) 838-8822**

**Not Applicable**
(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

As of October 4, 2005, there were 21,688,822 shares of the Company's common stock, $0.01 par value per share, issued and 19,819,972 shares outstanding.

| MATRIX SERVICE COMPA | RR Donnelley ProFile | chidoc1 9.0 | CHI venkr0dc | 06-Oct-2005 19:28 EST | 56137 TOC 1 | 1* |
| FORM 10-Q (8/31/05) | | ■ DAL | | | HTM IFV | 0C |

# INDEX

| | | PAGE NO. |
|---|---|---|

**PART I**    **FINANCIAL INFORMATION**

ITEM 1.    Financial Statements (Unaudited)

Consolidated Statements of Operations for the Three Months Ended August 31, 2005 and August 31, 2004 — 1

Consolidated Balance Sheets as of August 31, 2005 and May 31, 2005 — 2

Consolidated Statements of Cash Flow for the Three Months Ended August 31, 2005 and August 31, 2004 — 4

Consolidated Statements of Changes in Stockholders' Equity for the Three Months Ended August 31, 2005 and August 31, 2004 — 6

Notes to Consolidated Financial Statements — 7

ITEM 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations — 24

ITEM 3.    Quantitative and Qualitative Disclosures About Market Risk — 38

ITEM 4.    Controls and Procedures — 38

**PART II**    **OTHER INFORMATION**

ITEM 1.    Legal Proceedings — 40

ITEM 2.    Unregistered Sales of Equity Securities and Use of Proceeds — 40

ITEM 3.    Defaults Upon Senior Securities — 40

ITEM 4.    Submission of Matters to a Vote of Security Holders — 40

ITEM 5.    Other Information — 40

ITEM 6.    Exhibits — 41

Signature — 41

| MATRIX SERVICE COMPA | RR Donnelley ProFile | DALFBU-2K-PF001 9.0.21 CHI carrp0da | 07-Oct-2005 12:37 EST | 56137 TX 29 | 2* |
| FORM 10-Q (8/31/05) | | DAL | | HTM ESS | 0C |

Page 1 of 1

The following provides a roll forward of our backlog from May 31, 2005 to August 31, 2005.

|  | Construction Services | Repair and Maintenance Services | Total |
| --- | ---: | ---: | ---: |
|  | *(In Thousands)* | | |
| Backlog as of May 31, 2005 | $ 200,944 | $ 14,550 | $215,494 |
| New Backlog Awarded | 45,339 | 34,012 | 79,351 |
| Revenue Recognized on Contracts in Backlog | (51,602) | (17,315) | (68,917) |
| Backlog as of August 31, 2005 | $ 194,681 | $ 31,247 | $225,928 |

The following reconciles revenue recognized on contracts in backlog to total revenue for the first quarter of fiscal 2006.

|  | Construction Services | Repair and Maintenance Services | Total |
| --- | ---: | ---: | ---: |
|  | *(In Thousands)* | | |
| Revenue Recognized on Contracts in Backlog | $ 51,602 | $ 17,315 | $ 68,917 |
| Revenue Recognized on Contracts not in Backlog | 10,613 | 29,466 | 40,079 |
| Total Revenue Recognized | $ 62,215 | $ 46,781 | $108,996 |

### Non-GAAP Financial Measure

EBITDA is a supplemental, non-GAAP financial measure. EBITDA is defined as earnings before taxes, interest expense, depreciation and amortization. We have presented EBITDA because it is used by the financial community as a method of measuring our performance and of evaluating the market value of companies considered to be in similar businesses. We believe that the line item on our consolidated statements of operations entitled "net income (loss)" is the most directly comparable GAAP measure to EBITDA. Since EBITDA is not a measure of performance calculated in accordance with GAAP, it should not be considered in isolation of, or as a substitute for, net earnings as an indicator of operating performance. EBITDA, as we calculate it, may not be comparable to similarly titled measures employed by other companies. In addition, this measure does not necessarily represent funds available for discretionary use, and is not necessarily a measure of our ability to fund our cash needs. As EBITDA excludes certain financial information compared with net income (loss), the most directly comparable GAAP financial measure, users of this financial information should consider the type of events and transactions, which are excluded. Our non-GAAP performance measure, EBITDA, has certain material limitations as follows:

- It does not include interest expense. Because we have borrowed money to finance our operations, interest expense is a necessary and ongoing part of our costs and has assisted us in generating revenue. Therefore, any measure that excludes interest expense has material limitations.

- It does not include taxes. Because the payment of taxes is a necessary and ongoing part of our operations, any measure that excludes taxes has material limitations.

- It does not include depreciation and amortization expense. Because we use capital assets, depreciation and amortization expense is a necessary element of our costs and ability to generate revenue. Therefore, any measure that excludes depreciation and amortization expense has material limitations.

| MATRIX SERVICE COMPA | RR Donnelley ProFile | chidoc1 9.0 | CHI venkr0dc | 06-Oct-2005 19:29 EST | 56137 TX 30 | 1* |
| FORM 10-Q (8/31/05) | | | DAL | | HTM IFV | 0C |

Page 1 of 1

EBITDA for the three-month period ended August 31, 2005 was $4.8 million, compared to $1.1 million for the three-month period ended August 31, 2004. A reconciliation of EBITDA to net income (loss) follows:

|  | Three Months Ended | |
| --- | --- | --- |
|  | August 31, 2005 | August 31, 2004 |
|  | *(In Thousands)* | |
| Net Income (loss) | $ 375 | $ (892) |
| Interest Expense, net | 2,770 | 901 |
| Provision (benefit) for income taxes | 239 | (611) |
| Depreciation and amortization | 1,447 | 1,732 |
| EBITDA | $ 4,831 | $ 1,130 |

The $3.7 million increase in EBITDA for the three months ended August 31, 2005 as compared to three-month period for the prior year was primarily due to higher revenues in fiscal 2006 combined with the benefit of restructuring efforts, which led to a smaller fixed cost structure. In addition, EBITDA for fiscal 2006 was further enhanced by the gain on the sale of assets that were identified as part of the Company's restructuring efforts.

## Financial Condition & Liquidity

Historically, Matrix has financed its operations with cash from operations and from advances under its credit facility. Matrix's cash and cash equivalents totaled approximately $1.1 million at August 31, 2005 and approximately $1.5 million at May 31, 2005. In the three months ended August 31, 2005, operations provided $6.8 million of cash and financing activities used $8.5 million of cash. In the three months ended August 31, 2004, operations provided $17.3 million of cash and financing activities used $16.6 million of cash. This difference was primarily attributable to the improved payment of vendors in the three months ended August 31, 2005 as compared to the three months ended August 31, 2004 that occurred as a result of improved liquidity in fiscal 2006.

Accounts receivable decreased $14.2 million, or 20.2%, when comparing the balance of $55.9 million at August 31, 2005 to the balance of $70.1 million at May 31, 2005. This decline is relatively in line with the 15.7% reduction in revenues experienced for the three months ended August 31, 2005 compared to the three months ended May 31, 2005.

Cost in excess of billings was $22.6 million as of August 31, 2005 as compared to $22.7 million as of May 31, 2005. This decrease of $0.1 million is not consistent with the 15.7% reduction in revenues when comparing the three month periods ending August 31, 2005 and May 31, 2005. This inconsistency is due to a larger presence of projects whose contract terms provide for billings upon the completion of designated project milestones.

Accounts payable were $33.5 million as of August 31, 2005, as compared to $38.1 million as of May 31, 2005. This decrease of $4.6 million, or 12.1%, is relatively in line with the 15.7% reduction in revenues experienced for the three months ended August 31, 2005 compared to the three months ended May 31, 2005.

Other accrued expenses were $10.3 million as of August 31, 2005, which represents a decrease of $5.5 million from the $15.8 million balance as of May 31, 2005. This decline was due primarily to a reduction in payroll related liabilities.

## Credit Agreement and Revolving Credit Facility

On March 7, 2003, we replaced our prior credit agreement with an $87.5 million senior credit facility entered into with a group of banks. The credit agreement originally consisted of a five-year term loan of $32.5 million and a three-year $55 million revolving credit facility. Substantially all of our properties and assets and those of our domestic subsidiaries secure the senior credit facility. Under the original agreement, we paid LIBOR-based interest on funds borrowed under the term loan and funds borrowed on a revolving basis bore interest on a Prime or LIBOR-based option.

# EXHIBIT D

# 2005 ANNUAL REPORT





## MATRIX SERVICE COMPANY

*INDUSTRIAL SERVICE CONTRACTOR*

# MATRIX SERVICE COMPANY

## PRESIDENT'S MESSAGE

*Fiscal 2005 has been a difficult year and one we would rather not repeat. The changes we have made in late fiscal year 2005 and continuing into the first half of fiscal year 2006 will, however, put the Company in a position to return to profitable growth.*

*Fiscal 2006 will be a transition year with the emphasis on executing our work profitably, reducing our risk profile, improving margins and completing our restructuring and refinancing efforts.*

*In executing this transition, the first step was to assess all areas with the objective to eliminate unprofitable and marginal businesses and those that are non-core. As a result of this effort, we have sold our transportation and rigging assets and have a signed letter of intent to sell our aluminum floating roof business. We are also in the process of selling excess facilities or land in Tulsa, Oklahoma; Orange, California; and Holmes, Pennsylvania. These liquidity events, coupled with tax refunds, should yield approximately $12.0 million in cash, which has been or will be used to reduce bank debt and to improve liquidity. We have also exited a number of large routine maintenance contracts that were utilizing valuable resources while providing little, if any, return. As these maintenance contracts wound down, we were able to significantly reduce overhead and administration. As a result of these efforts and other efforts to reduce costs, we were able to reduce our administrative payroll and benefit costs by over $5.0 million on an annualized basis.*

*Our liquidity has improved significantly since the end of fiscal year 2005. Our bank debt has been reduced by $13.3 million, to $29.4 million as of August 12, 2005, from $42.7 million at the end of May 31, 2005. Simultaneously, we have been able to reduce payables 24.9%, which went a long way to improving vendor relationships. As of August 12, 2005, the availability under our revolving lines of credit was $18.3 million.*

*Despite the financial issues facing Matrix Service, our backlog stood at $215.5 million as of May 31, 2005, including the $97.0 million LNG project, which is expected to be completed over a 35-month period. We expect to recognize approximately $49 million in LNG revenues by the end of fiscal year 2006 and anticipate total fiscal year 2006 revenues of between $375 million to $425 million. Although we are not prepared to provide earnings guidance at this time, we are confident that our restructuring efforts will succeed and anticipate fiscal year 2006 will be profitable.*

*We are hopeful that the disputed receivables will be resolved by the end of fiscal year 2006, which, when coupled with the planned liquidity events discussed earlier and cash flow from operations, would allow us to be in a position to pay off most, if not all, of our bank debt.*

*We expect fiscal 2006 to be a successful year for Matrix Service and we would like to thank our employees, customers, vendors, business partners and shareholders for their continued support.*

MICHAEL J. HALL
*President and Chief Executive Officer*

# EXHIBIT E

| MATRIX SERVICE COMPA | RR Donnelley ProFile | DALFBU-2K-PF001 9.1.1 | CHI | carrp0da | 05-Jan-2006 15:41 EST | | 44284 FS 1 | 2* |
|---|---|---|---|---|---|---|---|---|
| FORM 10-Q (11/30/05) | | | ■ DAL | | | | HTM ESS | 0C |

Page 1 of 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-Q

---

**(Mark One)**

☒    **Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

For the quarterly period ended November 30, 2005

or

☐    **Transition Report Pursuant to Section 13 or 15 (d) of the Securities Exchange Act of 1934**

For the transition period from _____ to _____

Commission File number 001-15461

---

# MATRIX SERVICE COMPANY
(Exact name of registrant as specified in its charter)

---

**DELAWARE**                                                      **73-1352174**
(State of incorporation)                                    (I.R.S. Employer Identification No.)

**10701 E. Ute St., Tulsa, Oklahoma 74116-1517**
(Address of principal executive offices and zip code)

**Registrant's telephone number, including area code: (918) 838-8822**

**Not Applicable**
(Former name, former address and former fiscal year, if changed since last report)

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

As of January 4, 2006, there were 22,595,243 shares of the Company's common stock, $0.01 par value per share, issued and 20,772,643 shares outstanding.



| MATRIX SERVICE COMPA | RR Donnelley ProFile | chidoc1 9.1.1 | CHI indic0dc | 05-Jan-2006 02:01 EST | | 44284 TOC 1 | 3* |
|---|---|---|---|---|---|---|---|
| FORM 10-Q (11/30/05) | | | DAL | | | HTM ESS | 0C |

Page 1 of 1

# INDEX

|  |  | PAGE NO. |
|---|---|---|
| **PART I** | **FINANCIAL INFORMATION** | |
| ITEM 1. | Financial Statements (Unaudited) | |
| | Consolidated Statements of Operations for the Three and Six Months Ended November 30, 2005 and 2004 | 1 |
| | Consolidated Balance Sheets as of November 30, 2005 and May 31, 2005 | 2 |
| | Consolidated Statements of Cash Flow for the Six Months Ended November 30, 2005 and 2004 | 4 |
| | Consolidated Statements of Changes in Stockholders' Equity for the Six Months Ended November 30, 2005 and 2004 | 6 |
| | Notes to Consolidated Financial Statements | 7 |
| ITEM 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 27 |
| ITEM 3. | Quantitative and Qualitative Disclosures About Market Risk | 42 |
| ITEM 4. | Controls and Procedures | 42 |
| **PART II** | **OTHER INFORMATION** | |
| ITEM 1. | Legal Proceedings | 44 |
| ITEM 1A. | Risk Factors | 44 |
| ITEM 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 44 |
| ITEM 3. | Defaults Upon Senior Securities | 44 |
| ITEM 4. | Submission of Matters to a Vote of Security Holders | 45 |
| ITEM 5. | Other Information | 45 |
| ITEM 6. | Exhibits | 46 |
| | Signature | 46 |

| MATRIX SERVICE COMPA | RR Donnelley ProFile | chidoc1 9.2 | CHI  indic0dc | 05-Jan-2006 01:34 EST | 44284 TX 16 | 1* |
| FORM 10-Q (11/30/05) | | | DAL | | HTM IFV | 0C |

Page 1 of 1

The securities purchase agreement also limits the amount of senior obligations permitted under the senior credit facility or the refinancing or replacement thereof, including new and replacement letters of credit, to $90 million; limits capital lease obligations to $1 million, limits operating leases to $15 million, limits purchase money financing to $1 million and limits debt under the Company's performance and bonding line to $150 million.

As of November 30, 2005, $5 million of the convertible notes had been converted by note holders into 1,002,275 shares of the Company's Common Stock and $25 million of the convertible notes remained outstanding.

### Note 7 – Private Placement of Common Stock

On October 3, 2005, the Company completed a private placement of approximately 2.3 million shares of common stock. The common stock was priced at $6.50 per share. The net proceeds form the issuance were approximately $14.9 million. The Company used the proceeds to repay a portion of its outstanding balance on the Company's revolving line of credit in order to provide additional liquidity for working capital needs.

In connection with the private placement of common stock, on October 3, 2005, we entered into a registration rights agreement with the purchasers of the common stock. The registration rights agreement required us to file a registration statement with respect to the resale of the shares of our common stock issued in the private placement within 60 days after the closing date and to cause the registration statement to be declared effective by the SEC no later than the "effectiveness date," which is defined as the earlier of (i) 120 days after the closing, and (ii) five trading days after we are notified by the SEC that the registration statement will not be reviewed or is no longer subject to further review and comments. The registration statement was filed with the SEC on October 20, 2005 and was declared effective by the SEC on October 28, 2005. The registration rights agreement also requires us to use our best efforts to keep the registration statement continuously effective until the earlier of (a) the date on which all of the common stock covered by such registration statement has been sold or may be sold without volume restrictions pursuant to Rule 144(k) under the Securities Act of 1933, as amended, or (b) the fifth anniversary of the date the registration statement is declared effective by the SEC. If we fail to satisfy our obligations under the registration rights agreement, we will owe the holders of the common stock as partial liquidated damages an amount in cash equal to 1% of the aggregate amount paid for the common stock for each such event, and thereafter on each monthly anniversary of each such event (if the applicable failure shall not have been cured by such date) until the applicable failure is cured, we will owe the note holders an amount in cash equal to an additional 1% of the aggregate amount paid for the common stock.

### Note 8 – Acquisition Payable

As part of the purchase of the Hake group of companies in fiscal 2003, the Company entered into an acquisition payable for a portion of the purchase price. The acquisition payable was originally recorded at its fair value and accreted for the change in its present value each period utilizing a 5.1% effective interest rate. Payments related to the acquisition payable are due annually on March 7 with $1.5 million due annually in 2006, $1.9 million due in 2007 and $2.8 million due in 2008. Pursuant to the purchase agreement, the former shareholders of Hake are responsible for any tax exposures for periods ended March 7, 2003 or before. In fiscal 2006, the Company paid $0.4 million for tax obligation for a period prior to March 7, 2003. As the amount paid was the responsibility of former shareholders of Hake, the annual payment due March 7, 2006 has been reduced from $1.9 million to $1.5 million.

# EXHIBIT F



**MATRIX SERVICE**
INDUSTRIAL SERVICE CONTRACTOR

**FOR IMMEDIATE RELEASE**

### MATRIX SERVICE REPORTS FULLY DILUTED EARNINGS PER SHARE OF $0.10 IN THE SECOND QUARTER OF FISCAL 2006, ENDED NOVEMBER 30, 2005

**Second Quarter 2006 Highlights:**
- Revenues were $126.8 million versus $113.5 million a year earlier;
- Net income was $2.2 million compared with $1.3 million in the second quarter a year ago;
- Gross margins increased to 10.2% from 9.7% for the second quarter a year earlier; and
- Fully diluted EPS was $0.10 versus $0.07 in the same quarter a year ago.

**Six Month 2006 Highlights:**
- Revenues were $235.8 million versus $198.5 million for the same period in fiscal 2005; and
- Fully diluted EPS was $0.13 versus $0.02 a year earlier.

**TULSA, OK – January 5, 2006 – Matrix Service Co. (Nasdaq: MTRX),** a leading industrial services company, today reported its financial results for the second quarter of fiscal 2006, ended November 30, 2005. Total revenues for the quarter were $126.8 million compared to $113.5 million recorded in the second quarter of fiscal 2005.

Net income for the second quarter of fiscal 2006 was $2.2 million, or $0.10 per fully diluted share, versus $1.3 million, or $0.07 per fully diluted share, in the second quarter a year ago. These second quarter 2006 results include pre-tax charges and expenses of $0.8 million, or $0.02 per fully diluted share, for legal fees related to three major contract disputes. These results also include pre-tax charges of $1.1 million, or $0.03 per fully diluted share, for the accelerated amortization of certain previously paid bank fees in anticipation of the Company refinancing its senior facility which occurred on December 20, 2005. These charges were partially offset by $0.8 million, or $0.02 per fully diluted share, for pre-tax gains associated with the disposal of certain excess and non-core assets. EBITDA[1] for the second quarter of fiscal 2006 was $7.6 million, compared to $5.0 million for the same period last year. Gross margins on a consolidated basis for the current quarter were 10.2% compared to 9.7% reported in the same quarter a year ago. The gross margins were driven entirely by the improvement in the Repair & Maintenance Services segment.

Michael J. Hall, president and chief executive office of Matrix Service Company, said, "The restructuring and turnaround measures have been essentially completed with the refinancing of the $55 million senior credit facility announced on December 21, 2005 and the resolutions reached on our two largest disputed contracts for more than $20 million announced on December 28, 2005. During the past six months, total debt has been reduced by 38.1% from $72.7 million at May 31, 2005 to $45.0 million at November 30, 2005. With these latest dispute resolutions, we continue to believe Matrix Service will be essentially free of all bank debt by May 31, 2006, leaving us with only $25 million of long-term indebtedness related to our convertible notes."

---

(1)     The Company uses EBITDA (earnings before net interest, income taxes, depreciation and amortization) as part of its overall assessment of financial performance by comparing EBITDA between accounting periods. Matrix believes that EBITDA is used by the financial community as a method of measuring the Company's performance and of evaluating the market value of companies considered to be in similar businesses. EBITDA should not be considered as an alternative to net income or cash provided by operating activities, as defined by accounting principles generally accepted in the United States ("GAAP"). A reconciliation of EBITDA to net income is included at the end of this release.

Matrix Service Company
January 5, 2006
Page 2

Construction Services revenues for second quarter 2006 were $48.4 million compared to $59.9 million in the same period a year earlier. The decrease was a result of significantly lower construction work in the Power Industry, where second quarter revenues decreased 83.7% to $3.1 million, from $19.3 million in the second quarter of fiscal 2005, and by Other Industries' revenues, which declined 11.3% to $9.7 million, from $10.9 million for the year-earlier period. These decreases were partially offset by Downstream Petroleum Industry revenues, which increased 19.7% to $35.6 million, from $29.7 million a year earlier. Construction Services' gross margins were 8.5% versus 9.1% in the second quarter of fiscal 2005. The second quarter margin decline was primarily attributable to Power Industry margins from prior year jobs completed in the Eastern division and from the absence of higher margin nuclear work that had previously been sold as part of the restructuring.

Repair & Maintenance Services revenues advanced by $24.8 million, or 46.3%, in the second quarter of 2006 to $78.4 million, from $53.6 million in the same quarter in 2005. The increase was primarily a result of higher Downstream Petroleum Industry revenues, where second quarter revenues rose 58.1% to $74.1 million, from $46.9 million a year earlier, primarily as a result of higher turnaround work in the Eastern division. Gross margins were 11.3% in the quarter versus 10.3% in the second quarter a year ago. The Company benefited from the higher revenue volumes relative to its overall fixed cost structure.

Mr. Hall added, "While we are still not in a position to provide earnings guidance, we believe the strength demonstrated in our Construction Services segment, particularly in the Downstream Petroleum Industry, should continue. Repair & Maintenance revenues is expected to continue its strong performance through the balance of the year, particularly in the fourth fiscal quarter when some additional revenue will be realized from the repair work associated with the damage sustained in the Gulf Coast region from the recent hurricanes. Based upon these factors, we are raising our revenue guidance for fiscal 2006 to be between $450 million to $475 million compared to our previous guidance of between $400 million to $450 million."

**Six Months Results**

For the six months ended November 30, 2005, Matrix Service reported consolidated revenues of $235.8 million versus $198.5 million recorded in the year-earlier period.

Net income for the six month period was $2.5 million, or $0.13 per fully diluted share, versus $0.4 million, or $0.02 per fully diluted share for the same six month period a year earlier. These 2006 results include pre-tax charges and expenses of $1.3 million, or $0.03 per fully diluted share, for legal fees related to three major contract disputes. These results also include pre-tax charges of $2.2 million, or $0.05 per fully diluted share, for the accelerated amortization of certain previously paid bank fees in anticipation of the Company refinancing its senior facility which occurred on December 20, 2005. These charges were partially offset by $1.5 million, or $0.04 per fully diluted share, for pre-tax gains associated with disposed excess facilities and equipment. EBITDA[1] for the six months ended November 30, 2005 was $12.4 million, compared with $6.2 million for the year-earlier period. Consolidated gross margins increased to 9.8% from 8.9% a year earlier.

Revenues for the Construction Services segment were $110.6 million, compared with $104.3 million for the six months ending November 30, 2004. The increase was due to significantly higher construction work in the Downstream Petroleum Industry, where revenues for the six-month period increased 48.9% to $86.0 million versus $57.8 million for the same six-month period last year, and to higher Other Industries' revenues, which increased 12.5% to $17.9 million in the recent six-month period, versus $16.0 million a year earlier. Revenues declined in the Power Industry to $6.7 million, versus $30.6 million a

Matrix Service Company
January 5, 2006
Page 3

year earlier.  Gross margins in the Construction Services segment increased to 9.5% from 7.9% a year earlier, as the lower margin Power Industry work completed in fiscal 2005 was partially replaced with higher margin Downstream Petroleum Industry work.

Revenues for Repair & Maintenance Services rose $31.0 million, or 32.9%, to $125.2 million, for the six-month period ending November 30, 2005, from $94.2 million for the first six months of fiscal 2005.  The increase was primarily due to significantly higher Downstream Petroleum Industry work, where revenues rose 40.2% to $117.1 million, versus $83.5 million for the same six-month period last year.  Revenues also increased from the Power Industry to $5.9 million versus $4.9 million for the same six-month period last year.  These increases were partially offset by lower Other Industries' revenues, which fell 61.3% to $2.2 million in the six-month period from $5.8 million in the same six-month period last year.  Gross margins were 10.1% versus 10.0% a year earlier.

## Change in Independent Auditor

At a meeting held on January 3, 2006, the Audit Committee of the Board of Directors of Matrix Service Company (the "Company"), approved the engagement of Deloitte & Touche LLP as its independent registered public accounting firm for the fiscal year ending May 31, 2006 to replace the firm of Ernst & Young LLP, which was dismissed as independent registered public accounting firm of the Company, each effective January 6, 2006.

## Conference Call

In conjunction with the press release, Matrix Service will host a conference call with Michael J. Hall, president and CEO, and Les Austin, vice president and chief financial officer.  The call will take place at 11:00 a.m. (EST)/10:00 a.m. (CST) today and will be simultaneously broadcast live over the Internet at www.vcall.com.  Please allow extra time prior to the call to visit the site and download the streaming media software required to listen to the Internet broadcast.  The online archive of the broadcast will be available within one hour of completion of the live call.

**About Matrix Service Company**
Matrix Service Company provides general industrial construction and repair and maintenance services principally to the petroleum, petrochemical, power, bulk storage terminal, pipeline and industrial gas industries.

The Company is headquartered in Tulsa, Oklahoma, with regional operating facilities located in Oklahoma, Texas, California, Michigan, Pennsylvania, Illinois, Washington, and Delaware in the U.S. and Canada.

This release contains forward-looking statements that are made in reliance upon the safe harbor provisions of the Private Securities Litigation Reform Act of 1995  These statements are generally accompanied by words such as "anticipate," "continues," "expect," "forecast," "outlook," "believe," "estimate," "should" and "will" and words of similar effect that convey future meaning, concerning the Company's operations, economic performance and management's best judgment as to what may occur in the future.  Future events involve risks and uncertainties that may cause actual results to differ materially from those we currently anticipate.  The actual results for the current and future periods and other corporate developments will depend upon a number of economic, competitive and other influences, including those identified in the "Risk Factors" and "Forward Looking Statements" sections and elsewhere in the Company's reports and filings made from time to time with the Securities and Exchange Commission.  Many of these risks and uncertainties are beyond the control of the Company, and any one of which, or a combination of which, could materially and adversely affect the results of the Company's operations and its financial condition.  We undertake no obligation to update information contained in this release.

**For more information, please contact:**

**Matrix Service Company**
Les Austin
Vice President Finance and CFO
T: 918-838-8822
E: laustin@matrixservice.com

**Investors and Financial Media:**
Truc Nguyen
The Global Consulting Group
T: 646-284-9418
E: tnguyen@hfgcg.com

Matrix Service Company
January 5, 2006
Page 4

Matrix Service Company
Consolidated Statements of Operations
(In thousands, except share and per share data)

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | November 30, 2005 | November 30, 2004 | November 30, 2005 | November 30, 2004 |
| | (unaudited) | | (unaudited) | |
| Revenues | $ 126,778 | $ 113,522 | $ 235,774 | $ 198,461 |
| Cost of revenues | 113,819 | 102,554 | 212,632 | 180,779 |
| Gross profit | 12,959 | 10,968 | 23,142 | 17,682 |
| Selling, general and administrative expenses | 7,487 | 7,740 | 14,694 | 14,873 |
| Impairment and abandonment costs | 70 | - | 70 | - |
| Restructuring | 45 | (27) | 367 | 148 |
| Operating income | 5,357 | 3,255 | 8,011 | 2,661 |
| Other income (expense): | | | | |
| Interest expense | (2,638) | (1,096) | (5,415) | (1,997) |
| Interest income | 2 | 1 | 9 | 1 |
| Other | 838 | 22 | 1,568 | 14 |
| Income before income taxes | 3,559 | 2,182 | 4,173 | 679 |
| Income tax provision | 1,391 | 889 | 1,630 | 278 |
| Net income | $ 2,168 | $ 1,293 | $ 2,543 | $ 401 |
| Basic earnings per common share | $ 0.11 | $ 0.07 | $ 0.14 | $ 0.02 |
| Diluted earnings per common share | $ 0.10 | $ 0.07 | $ 0.13 | $ 0.02 |
| Weighted average common shares outstanding: | | | | |
| Basic | 19,537,664 | 17,319,133 | 18,477,718 | 17,294,411 |
| Diluted | 25,693,625 | 17,605,025 | 24,881,711 | 17,673,718 |

Matrix Service Company
January 5, 2006
Page 5

**Matrix Service Company**
**Consolidated Balance Sheets**
(In thousands)

| | November 30, 2005 | May 31, 2005 |
|---|---|---|
| **Assets** | (unaudited) | |
| | | |
| Current assets: | | |
| Cash and cash equivalents | $    2,496 | $    1,496 |
| Accounts receivable, less allowances (November 30, 2005 - $632, May 31, 2005 - $461) | 61,317 | 70,088 |
| Contract dispute receivables, net | 22,179 | 20,975 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 28,106 | 22,733 |
| Inventories | 3,741 | 4,739 |
| Income tax receivable | 670 | 3,004 |
| Deferred income taxes | 4,739 | 4,820 |
| Prepaid expenses | 5,717 | 8,245 |
| Assets held for sale | 1,488 | 1,479 |
| Total current assets | 130,453 | 137,579 |
| | | |
| Property, plant and equipment at cost: | | |
| Land and buildings | 22,754 | 23,087 |
| Construction equipment | 28,908 | 29,711 |
| Transportation equipment | 10,544 | 10,862 |
| Furniture and fixtures | 9,057 | 8,889 |
| Construction in progress | 945 | 318 |
| | 72,208 | 72,867 |
| Accumulated depreciation | (37,163) | (35,791) |
| | 35,045 | 37,076 |
| | | |
| Goodwill | 23,510 | 24,834 |
| | | |
| Other assets | 1,425 | 2,891 |
| | | |
| Total assets | $190,433 | $ 202,380 |

Matrix Service Company
January 5, 2006
Page 6

**Matrix Service Company**
**Consolidated Balance Sheets**
(In thousands, except share data)

| | November 30, 2005 (unaudited) | May 31, 2005 |
|---|---|---|
| **Liability and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $   32,311 | $   38,059 |
| Billings on uncompleted contracts in excess of costs and estimated earnings | 13,508 | 12,311 |
| Accrued insurance | 4,827 | 5,038 |
| Other accrued expenses | 14,187 | 15,759 |
| Current capital lease obligation | 299 | 113 |
| Current portion of long-term debt | 20,004 | 42,765 |
| Current portion of acquisition payable | 1,472 | 1,808 |
| Total current liabilities | 86,608 | 115,853 |
| | | |
| Convertible notes | 25,000 | 30,000 |
| Acquisition payable | 4,276 | 4,169 |
| Long-term capital lease obligation | 548 | 231 |
| Deferred income taxes | 3,618 | 4,142 |
| | | |
| Stockholders' equity: | | |
| Common stock - $.01 par value; 30,000,000 shares authorized and 22,595,243 and 19,285,276 shares issued as of November 30, 2005 and May 31, 2005, respectively | 226 | 193 |
| Additional paid-in capital | 75,612 | 56,322 |
| Retained deficit | (769) | (3,307) |
| Accumulated other comprehensive income (loss) | 421 | (22) |
| | 75,490 | 53,186 |
| | | |
| Less:  treasury stock, at cost – 1,838,700 and 1,873,750 shares as of November 30, 2005 and May 31, 2005, respectively | (5,107) | (5,201) |
| | | |
| Total stockholders' equity | 70,383 | 47,985 |
| | | |
| Total liabilities and stockholders' equity | $ 190,433 | $ 202,380 |

Matrix Service Company
January 5, 2006
Page 7

**Matrix Service Company**
**Segment Information**
(In thousands)

| | Construction Services | Repair & Maintenance Services | Other | Combined Total |
|---|---|---|---|---|
| **Three Months Ended November 30, 2005** | | | | |
| Gross revenues | $ 50,589 | $ 78,547 | $ - | $ 129,136 |
| Less: Inter-segment revenues | (2,186) | (172) | - | (2,358) |
| Consolidated revenues | 48,403 | 78,375 | - | 126,778 |
| Gross profit | 4,111 | 8,848 | - | 12,959 |
| Operating income | 1,297 | 4,060 | - | 5,357 |
| Income before income tax expense | 260 | 3,299 | - | 3,559 |
| Net income | 153 | 2,015 | - | 2,168 |
| | | | | |
| Segment Assets | 92,239 | 64,578 | 33,616 | 190,433 |
| Capital Expenditures | 551 | 129 | 456 | 1,136 |
| Depreciation and amortization expense | 684 | 733 | - | 1,417 |
| | | | | |
| **Three Months ended November 30, 2004** | | | | |
| Gross revenues | $ 62,831 | $ 53,681 | $ - | $ 116,512 |
| Less: Inter-segment revenues | (2,885) | (105) | - | (2,990) |
| Consolidated revenues | 59,946 | 53,576 | - | 113,522 |
| Gross profit | 5,440 | 5,528 | - | 10,968 |
| Operating income | 1,278 | 1,950 | 27 | 3,255 |
| Income before income tax expense | 552 | 1,603 | 27 | 2,182 |
| Net income | 329 | 948 | 16 | 1,293 |
| | | | | |
| Segment Assets | 119,478 | 63,389 | 29,259 | 212,126 |
| Capital Expenditures | 168 | 120 | 107 | 395 |
| Depreciation and amortization expense | 921 | 850 | - | 1,771 |
| | | | | |
| **Six Months ended November 30, 2005** | | | | |
| Gross revenues | $ 114,834 | $ 125,483 | $ - | $ 240,317 |
| Less: Inter-segment revenues | (4,216) | (327) | - | (4,543) |
| Consolidated revenues | 110,618 | 125,156 | - | 235,774 |
| Gross profit | 10,552 | 12,590 | - | 23,142 |
| Operating income | 3,781 | 4,230 | - | 8,011 |
| Income before income tax expense | 1,289 | 2,884 | - | 4,173 |
| Net income | 786 | 1,757 | - | 2,543 |
| | | | | |
| Segment Assets | 92,239 | 64,578 | 33,616 | 190,433 |
| Capital Expenditures | 1,169 | 218 | 688 | 2,075 |
| Depreciation and amortization expense | 1,384 | 1,480 | - | 2,864 |
| | | | | |
| **Six Months ended November 30, 2004** | | | | |
| Gross revenues | $ 109,610 | $ 94,438 | $ - | $ 204,048 |
| Less: Inter-segment revenues | (5,338) | (249) | - | (5,587) |
| Consolidated revenues | 104,272 | 94,189 | - | 198,461 |
| Gross profit | 8,232 | 9,450 | - | 17,682 |
| Operating income | 310 | 2,499 | (148) | 2,661 |
| Income before income tax expense | (983) | 1,810 | (148) | 679 |
| Net income | (588) | 1,077 | (88) | 401 |
| | | | | |
| Segment Assets | 119,478 | 63,389 | 29,259 | 212,126 |
| Capital Expenditures | 256 | 208 | 323 | 787 |
| Depreciation and amortization expense | 1,802 | 1,701 | - | 3,503 |

Matrix Service Company
January 5, 2006
Page 8

**Segment revenue from external customers by industry type are as follows:**

| | Construction Services | Repair & Maintenance Services | Total |
|---|---|---|---|
| **Three Months Ended November 30, 2005** | | | |
| Downstream Petroleum Industry | $ 35,547 | $ 74,126 | $ 109,673 |
| Power Industry | 3,148 | 2,986 | 6,134 |
| Other Industries | 9,708 | 1,263 | 10,971 |
| Total | $ 48,403 | $ 78,375 | $ 126,778 |
| | | | |
| **Three Months Ended November 30, 2004** | | | |
| Downstream Petroleum Industry | $ 29,687 | $ 46,873 | $ 76,560 |
| Power Industry | 19,314 | 3,560 | 22,874 |
| Other Industries | 10,945 | 3,143 | 14,088 |
| Total | $ 59,946 | $ 53,576 | $ 113,522 |
| | | | |
| **Six Months Ended November 30, 2005** | | | |
| Downstream Petroleum Industry | $ 85,982 | $ 117,069 | $ 203,051 |
| Power Industry | 6,692 | 5,855 | 12,547 |
| Other Industries | 17,944 | 2,232 | 20,176 |
| Total | $ 110,618 | $ 125,156 | $ 235,774 |
| | | | |
| **Six Months Ended November 30, 2004** | | | |
| Downstream Petroleum Industry | $ 57,753 | $ 83,502 | $ 141,255 |
| Power Industry | 30,568 | 4,923 | 35,491 |
| Other Industries | 15,951 | 5,764 | 21,715 |
| Total | $ 104,272 | $ 94,189 | $ 198,461 |

Other Industries consists primarily of liquefied natural gas, wastewater, food and beverage, manufacturing and paper industries.

Matrix Service Company
January 5, 2006
Page 9

## Non-GAAP Financial Measure

EBITDA is a supplemental, non-GAAP financial measure.  EBITDA is defined as earnings before interest expense, taxes, depreciation and amortization.  We have presented EBITDA because it is used by the financial community as a method of measuring our performance and of evaluating the market value of companies considered to be in similar businesses.  We believe that the line item on our consolidated statements of operations entitled "net income" is the most directly comparable GAAP measure to EBITDA. Since EBITDA is not a measure of performance calculated in accordance with GAAP, it should not be considered in isolation of, or as a substitute for, net earnings as an indicator of operating performance. EBITDA, as we calculate it, may not be comparable to similarly titled measures employed by other companies.  In addition, this measure does not necessarily represent funds available for discretionary use, and is not necessarily a measure of our ability to fund our cash needs.  As EBITDA excludes certain financial information compared with net income, the most directly comparable GAAP financial measure, users of this financial information should consider the type of events and transactions, that are excluded. Our non-GAAP performance measure, EBITDA, has certain material limitations as follows:

- It does not include interest expense.  Because we have borrowed money to finance our operations, interest expense is a necessary and ongoing part of our costs and has assisted us in generating revenue.  Therefore, any measure that excludes interest expense has material limitations.

- It does not include taxes.  Because the payment of taxes is a necessary and ongoing part of our operations, any measure that excludes taxes has material limitations.

- It does not include depreciation and amortization expense.  Because we use capital assets, depreciation and amortization expense is a necessary element of our costs and ability to generate revenue.  Therefore, any measure that excludes depreciation and amortization expense has material limitations.

EBITDA for the six-month period ended November 30, 2005 was $12.4 million, compared to $6.2 million for the six-month period ended November 30, 2004.  A reconciliation of EBITDA to net income follows:

|  | Three Months Ended | | Six Months Ended | |
|  | November 30, 2005 | November 30, 2004 | November 30, 2005 | November 30, 2004 |
| --- | --- | --- | --- | --- |
|  | (In thousands) | | (In thousands) | |
| Net income | $  2,168 | $1,293 | $  2,543 | $    401 |
| Interest expense, net | 2,636 | 1,095 | 5,406 | 1,996 |
| Provision for income taxes | 1,391 | 889 | 1,630 | 278 |
| Depreciation and amortization | 1,417 | 1,771 | 2,864 | 3,503 |
| EBITDA | $  7,612 | $5,048 | $ 12,443 | $6,178 |

The $6.2 million increase in EBITDA for the six months ended November 30, 2005 as compared to six-month period for the prior year was primarily due to higher revenues and margins in fiscal 2006 combined with the benefit of restructuring efforts, which led to a lower fixed cost structure.  In addition, EBITDA for fiscal 2006 was further enhanced by gains on the sale of assets that were part of the Company's restructuring efforts.