# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALLIED ENVIRONMENTAL SOLUTIONS, INC.,**<br>    formerly known as,<br>    Lurgi Lentjes North America, Inc.<br>    9730 Patuxent Woods Drive, Suite 100<br>    Columbia, Maryland  21046-1626,<br><br>            Petitioner,<br><br>    v.<br><br>**FRANK W. HAKE, INC.,**<br>    1500 Chester Pike<br>    Eddystone, Pennsylvania 19022,<br><br>            Respondent. | **Civil Action No. 06-0527-RMU** |

## DECLARATION OF GLENN M. AZZINARI

I, Glenn M. Azzinari, declare as follows:

1. I am over the eighteen years of age and am competent to give the testimony set forth in this Declaration.

2. I have been an attorney at law in the State of New York since 1992. I am a partner of the law firm Wormser, Kiely, Galef & Jacobs LLP, which serves as outside general counsel for the Petitioner, Allied Environmental Solutions, Inc. (formerly known as Lurgi Lentjes North America, Inc. ("Lurgi")).

3. This declaration is submitted in reply to Respondent Frank W. Hake, Inc.'s ("Hake's") opposition to Lurgi's Motion to Vacate the Arbitration Award in order to clarify my role as counsel during the underlying arbitration and to correct several misstatements of fact contained in Hake's papers.

## My Professional Background

4. I have been a partner at my firm since 2001, and work principally on matters involving the Lurgi group of companies ("Lurgi Group"), including its U.S. subsidiary now known as Allied Environmental Solutions, Inc. My firm serves as outside general counsel in the U.S. to the Lurgi Group, which is a group of internationally known and respected engineering companies headquartered in Germany.

5. I am a transactional attorney, and my practice focuses principally on commercial and contract matters for the Lurgi Group and other clients. During the early stages of my legal career as an associate, I had some involvement in litigation matters. Although I have served as a "second chair" on several arbitrations, I have never served as lead counsel at any major arbitration or trial.

## The Dispute Between Lurgi and Hake

6. This dispute involves a subcontract between Hake and Lurgi regarding the construction of two selective catalytic reactor systems at a PSEG facility located in Hamilton Township, New Jersey. The dollar amount of the contract between Lurgi and Hake was approximately $29 million. The parties have each asserted multi-million dollar claims against the other.

7. In my role as general counsel to Lurgi, I participated in the mediation before JAMS mediator Honorable Richard Levie, Ret., with other Lurgi business and project representatives. Lurgi approached the mediation in good faith and attempted to facilitate an amicable settlement of the dispute. The mediation, at least from Lurgi's perspective, was not an adversarial proceeding. Prior to the mediation, no discovery was exchanged between the parties. My role during the mediation process was to represent Lurgi and liaise with its business and

project representatives during our discussions with the JAMS mediator and Hake's counsel and representatives.

8. The mediation did not resolve the parties' underlying disputes. Hake subsequently initiated the underlying arbitration proceeding which is the subject of the pending motions.

9. Once the matter shifted from mediation to arbitration, I ceded principal responsibility in this matter to Lurgi's trial counsel, namely, the New Jersey firm of Stark & Stark, and lead trial counsel Craig Hilliard.

10. During the course of the arbitration, I played a secondary role and served mainly as a liaison between trial counsel and Lurgi. I generally monitored the case and advised Lurgi's officers and directors of its progress.

11. As Hake and its counsel are well aware, my role during discovery was limited. I did not attend a single document production, did not review the Hake documents when they were ultimately produced, did not prepare or meet with any of the Lurgi deposition witnesses, and did not conduct, defend or attend a single deposition of any witness.

### The Arbitration Scheduling Conference

12. I joined Craig Hilliard at the initial scheduling conference before Arbitrator Curtis von Kann, which was held at the JAMS offices in Washington, D.C. on April 4, 2005. It was during this conference that Hake's counsel first informed the Arbitrator and Lurgi's counsel that Hake and its parent company, Matrix, were allegedly experiencing extreme financial difficulty and required an expedited proceeding. I specifically recall one of the Hake attorneys telling the Arbitrator that scheduling any hearings after June 2005 could be problematic because, in sum and substance, "after then, we may very well not be around anymore." Hake's counsel presented

no financial information or evidence of any kind to demonstrate its professed hardship. I have subsequently reviewed the financial data that Matrix publishes on its Internet web site showing its 2005 profits, which would indicate that Hake's financial position was not as dire as represented.

13. Hake also drastically misstated to the Arbitrator the volume of its anticipated discovery production in an effort to bolster its request for an expedited hearing. Specifically, Hake's counsel estimated that Hake's documents were contained in approximately "twenty" boxes. Stark & Stark would later inform me that Hake ultimately produced in excess of 100 boxes of records.

14. Due to the complexity of several of the major issues in dispute (many of which were interrelated and involved highly technical and voluminous records), the anticipated scope of discovery, and the amount in controversy, Mr. Hilliard believed that Lurgi needed at least six to eight months to properly prepare the case. Accordingly, Mr. Hilliard presented these concerns to the Arbitrator and requested that hearings be scheduled in the first quarter of 2006.

15. Despite the validity of Mr. Hilliard's concerns, the Arbitrator informed the parties that he had already scheduled another large international arbitration for the latter part of 2005. Thus, given the constraints of his own schedule and Hake's professed financial situation, he wanted to "squeeze in" the arbitration before his other matter began.

16. In my view, the Arbitrator made Hake's purported financial predicament and his own calendar overriding priorities in terms of the arbitration schedule and the conduct of the hearings -- rather than ensuring that each party had the opportunity to fairly develop and present its case. Ultimately, the hearings were set to commence in early September 2005. As the events

4

which are the subject of Lurgi's motion reveal, the Arbitrator doggedly clung to that schedule in spite of overwhelming circumstances and prejudice to Lurgi.

### The Discovery Phase

17. During the period from April through August 2005, my interactions with Lurgi's litigation counsel were principally with Craig Hilliard. My dealings with his associate, Martin Schrama, were generally limited to those times when Mr. Hilliard was not available or when he joined Mr. Hilliard in a discussion with me. Both Messrs. Hilliard and Schrama were deeply involved in the discovery phase of the arbitration, but Mr. Hilliard was in all respects the lead litigation counsel.

18. Hake's opposition brief avers that I principally argued a discovery motion during a conference call with Arbitrator von Kann in July 2005, which is then used as "evidence" that I was in a position to assume the role of lead counsel in this arbitration. Hake's brief misstates the facts. Mr. Hilliard actively participated in that call and spoke as lead counsel for Lurgi. However, as part of that call, Hake raised an issue concerning Hake's demand to gain access to certain privileged materials (claim binders prepared in connection with a different subcontractor on the same project). I responded to questions from the Arbitrator concerning the contents of these binders because I was most familiar with the issue. (The binders themselves were wholly unrelated to the Hake dispute.) Mr. Hilliard appropriately took the lead in all other dealings with the Arbitrator, as he was Lurgi's lead trial counsel.

19. My last dealings with Mr. Hilliard were in the second half of August 2005. I specifically recall a discussion concerning what Mr. Hilliard perceived to be substantially revised positions taken by Hake's expert, Walter Wachter, at his expert deposition in late August 2005.

5

### Late August/Early September 2005 (Mr. Hilliard's Leave of Absence)

20.    In late August 2005, I had travel to Dallas, Texas, to attend contract negotiations on behalf of a different member of the Lurgi Group. I was the lead attorney during those negotiations on a $100 million project. During the course of my meetings in Dallas, I received an urgent phone call from Mr. Hilliard. He informed me that he was taking a leave of absence from his firm effective immediately for personal reasons that required his immediate withdrawal from the practice of law for an indeterminate time.

21.    Out of respect for Mr. Hilliard's privacy, and given the circumstances, I acknowledged his decision and said that I would deal from that point on with Mr. Hilliard's managing partner, Lew Pepperman, with whom I had never spoken prior to that time. I had several follow-up phone calls with other partners at my law firm to discuss this development during breaks in the negotiations I was leading in Dallas, which demanded my full-time involvement for several days.

22.    Other than my leaving Mr. Hilliard a couple of voicemails on his office telephone number to offer encouragement and support, I did not again speak with Mr. Hilliard until early 2006 (after the close of the hearings).

### Subsequent Events

23.    Upon my return to New York the week of September 6, 2005, I was informed that the Arbitrator had refused Lurgi's request for a reasonable extension to allow Stark & Stark's replacement trial counsel (Kevin Hart) to become familiar with the case. At some point that week, I was introduced for the first time to Mr. Hart, whom I had never met before.

24.    I was also surprised to learn that during a call with Arbitrator von Kann, Hake's counsel had reportedly made the statement that I was in the position to assume the lead trial

counsel role for hearings set to commence in less than ten days. Hake's counsel was fully aware that I had not participated in any substantive discussions with them, conducted or even attended any depositions, or dealt with them directly on any issues concerning the arbitration.

25.  In particular, I was informed that during that same call, Hake's counsel and cited selected portions of my law firm's Internet web site biography indicating that I had experience in litigation and arbitration. A complete copy of my current biography is attached as Exhibit A, and can of course be reviewed by visiting my firm's web site at www.wkgj.com.

26.  On information and belief, the biographical information set forth in the attached Exhibit A is identical to what would have appeared on my firm's web site in August and September of 2005, when Hake claims to have reviewed it. The information in Exhibit A is factually accurate. My biography indicates that I concentrate primarily in the area of commercial and contract law, including the negotiation of design-build and other construction contracts. It concludes with the statement that "[i]n the litigation area, [Mr. Azzinari] often supervises local counsel in other jurisdictions." That is precisely the role I played with Stark & Stark, after that firm was retained as trial counsel. My role was one strictly of supervisor and client liaison.

27.  As I have no experience as a lead trial counsel in any major litigation, I was not an appropriate candidate to replace Mr. Hilliard after his sudden withdrawal from the case.

28.  In the few days prior to the commencement of the hearing (on September 19, 2006), my substantive involvement in the case was limited to a couple of telephone calls with Mr. Hart to discuss the case in broad terms and assisting in the drafting of a letter to Arbitrator von Kann, which confirmed that Lurgi was proceeding in the arbitration under protest given the circumstances of extreme prejudice.

Pursuant to 28 U.S.C. § 1746, I declare under the penalties of perjury that the foregoing declaration is true and correct.

Executed on: May 22, 2006

_____
Glenn M. Azzinari

# EXHIBIT A

# ATTORNEYS



**E-mail:**
gazzinari@wkgj.com

**Direct Phone:**
212-573-0671

**Glenn M. Azzinari**

**Partner, Corporate and Commercial Law**
**New York**

***Areas of Experience***
Design/Build Contracts
Construction Contracts
Commercial Litigation and Arbitration
International Arbitration

***Professional Summary***
Mr. Azzinari joined the firm in 1991 and became a partner on January 1, 2001. He concentrates primarily in the area of commercial and contract law, including the negotiation and preparation of design/build and other construction contracts for large industrial facilities, as well as related subcontracts and other agreements governing matters such as technology licensing and consortiums. Mr. Azzinari also practices in the areas of litigation and arbitration of commercial and construction disputes, and has conducted or been involved in trials and proceedings before the federal and state courts of New York, the International Court of Arbitration, the American Arbitration Association and JAMS. In the litigation area, he often supervises local counsel in other jurisdictions.

***Education***
J.D. Boston University, honors, 1991
B.A. Queens College, cum laude, 1988

***Admissions***
New York
United States District Court, Southern District of New York
United States District Court, Eastern District of New York

***Memberships***
New York State Bar Association
WKGJ Hiring Committee
WKGJ Technology Committee
WKGJ Records Committee

***Jump to profiles by using the menu below:***
Choose an attorney profile 

HOME | ATTORNEY PROFILES | PRACTICE GROUPS | CONTACT US | NEWSLETTER |
OFFICES | TERMS OF USE